Jon A. Atabek, Esq. (Cal. SBN 269497)
  *(jatabek@atabekandco.com)*
Nyja A. Prior, Esq. (Cal. SBN 342948)
  *(nprior@atabekandco.com)*
**ATABEK & CO.**
250 Newport Center Drive, Suite 306
Newport Beach, CA 92660
Telephone: (949) 229-0953
Facsimile:  (213) 402-3413

Xinlin Li Morrow, Esq. (Cal. SBN 281707)
  *(xinlin@moni.law)*
**MORROW NI LLP**
3333 Michelson Dr, Ste 300
Irvine, CA 92612-1683
Telephone: 213-282-8166

Attorneys for Plaintiff ZAPTERA USA, INC.

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZAPTERA USA, INC., a California corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>APTERA MOTORS CORP., a Delaware corporation; STEVE FAMBRO, an individual; CHRIS ANTHONY, an individual; MICHAEL JOHNSON, an individual; JASON HILL, an individual; NATHAN ARMSTRONG, an individual; and DOES 1 through 100, inclusive,<br><br>    Defendants. | Case No.: 24CV1413-JO-JLB<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES, AND INJUNCTIVE RELIEF:**<br><br>1. **INFRINGEMENT OF U.S. PATENT NO. D633821 [35 U.S.C. 271, et seq];**<br>2. **INFRINGEMENT OF U.S. PATENT NO. D635487 [35 U.S.C. 271, et seq];**<br>3. **THEFT OF TRADE SECRETS [18 U.S.C. 1831, et seq];**<br>4. **BREACH OF CONTRACT;**<br>5. **DECLARATORY JUDGMENT.**<br><br>**JURY TRIAL DEMANDED** |

 **COMES NOW**, Plaintiff ZAPTERA USA, INC., by and through its counsel of record, and hereby respectfully submits this Second Amended Complaint and alleges as follows:



1

## I. <u>INTRODUCTION</u>

1.    More than twelve years ago, Aptera Motors, Inc., went defunct, liquidating its assets through a general assignment for the benefit of creditors (the "ABC"). Plaintiff purchased all of the assets out of that ABC, including all trademarks, patents, copyrights, and trade secrets.

2.    However, approximately ten years later, Defendants resuscitated Aptera Motors as Aptera Motors Corp., using many of the same people, and many of the same assets, that Defendants had sold to Plaintiff during the ABC.  Defendants did so deliberately after the death of Rick Derringer, when Defendants thought there was no one left to enforce claims related to Defendants' resumed use of assets Defendants previously sold to Plaintiff.

3.    Plaintiff made a formal demand on Defendants through counsel in advance of filing this suit. However, Defendants chose to reject that demand.

4.    In the meantime, Defendants continue to offer for sale and pre-sell tens of thousands of vehicles that practice patents and trade secrets owned by Plaintiff and raise millions of dollars from investors.

5.    Defendants go so far as to cite "their" patents and other Intellectual Property ("IP") as part of their success strategy in their public disclosures with the United States Securities and Exchange Commission ("SEC"), public interviews, and marketing materials. However, even brief reference to those patents and IP makes clear Defendants are purporting to have patented improvements to Plaintiff's existing patents and IP. For example, review of Plaintiff's disclosure statements submitted to the United States Patent and Trademark Office ("USPTO") reference Plaintiff's patents, proving Defendants' knowledge of them. Yet, Defendants' SEC disclosures do not reference Plaintiff's patents—because Defendants knew they did not own Plaintiff's patents.  Defendants' knowledge of this fact is further supported by Defendants' public interviews in which they referend stating loyal to the original design.



2

**SECOND AMENDED COMPLAINT**

6. Plaintiff now seeks damages for Defendants' infringement on, and theft of, Plaintiff's intellectual property.

## II. THE PARTIES

7. Plaintiff ZAPTERA USA, INC. ("Zaptera") is, and at all times relevant herein was, a corporation organized under the laws of the State of California, with its principal place of business in the County of Sonoma, California.

8. Plaintiff is informed and believes, and based thereon alleges Defendant APTERA MOTORS CORP. ("Aptera Motors") is, and at all times relevant herein was a corporation organized under the laws of the State of Delaware, with its principal place of business in the City of Carlsbad, County of San Diego, State of California.

9. Plaintiff is informed and believes, and based thereon alleges Defendant STEVE FAMBRO ("Fambro") is, and at all times relevant herein was an individual residing in the State of California, county of San Diego.

10. Plaintiff is informed and believes, and based thereon alleges Defendant CHRIS ANTHONY ("Anthony") is, and at all times relevant herein was an individual residing in the State of California, county of San Diego.

11. Plaintiff is informed and believes, and based thereon alleges Defendant MICHAEL JOHNSON ("Johnson") is, and at all times relevant herein was an individual residing in the State of California, county of San Diego.

12. Plaintiff is informed and believes, and based thereon alleges Defendant JASON HILL ("Hill") is, and at all times relevant herein was an individual residing in the State of California, county of Orange.

13. Plaintiff is informed and believes, and based thereon alleges Defendant NATHAN ARMSTRONG ("Armstrong") is, and at all times relevant herein was an individual residing in Calgary, Canada.

14. Plaintiff is unaware of the true names and capacities of those defendants sued herein as DOE defendants. Plaintiff will amend this Complaint to allege said defendants' true names and capacities when that information becomes known to them.



3

**SECOND AMENDED COMPLAINT**

Plaintiff is informed and believes, and thereon allege, that these DOE defendants are legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants legally and approximately caused the injuries and damages by reason of negligent, careless, deliberately indifferent, intentional willful or wanton misconduct, including the misconduct in creating and otherwise causing the incidents, conditions and circumstances hereinafter set forth, by reason of direct or imputed negligence or vicarious fault or breach of duty arising out of the matters herein alleged. Plaintiff will seek leave to amend this Complaint to set forth said true names and identities of the DOE defendants when they are ascertained.

15.    Plaintiff is informed and believes, and thereon alleges, that, at all times herein mentioned, each of the defendants was the agent and/or employee and/or co-conspirator of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy and with the permission and consent of the other co-defendants. The acts of each of the Defendants, its officers and employees, were adopted by and ratified by the remaining Defendants. Each of Defendant either encouraged, assisted, ratified and/or with deliberate indifference failed to prevent any of the acts complained of herein.

### III.    <u>VENUE AND JURISDICTION.</u>

16.    This Court has exclusive jurisdiction over one or more claims brought under federal law pursuant to 28 U.S.C. §§ 1331, 1338, and 1343, and supplemental jurisdiction over state law claims arising from common facts pursuant to 28 U.S.C. § 1367. This Court also has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17.    Venue is proper in the Southern District of California because the majority of the defendants reside in this judicial district within the meaning of 28 U.S.C. § 1391 and because the events, acts, and omissions giving rise to Plaintiff's claims occurred in the Southern District of California. Venue is proper under 28 U.S.C. § 1400(b) because Defendants reside in this Judicial District or have committed



**SECOND AMENDED COMPLAINT**

1  acts of infringement and have a regular and established place of business in this
2  Judicial District.

3  ### IV.  GENERAL FACTUAL ALLEGATIONS.

4  **A. Aptera Motors, Inc. – From Inception to its 2012 Liquidation.**

5  18.  Plaintiff is informed and believes Fambro, Anthony, and Johnson
6  (collectively, the "Founders") founded Aptera Motors, Inc. in 2006. The Founders
7  identify themselves on Aptera's website (https://aptera.us/about) as follows:



26  19.  Indeed, their website boasts, "The founders of Aptera, Chris Anthony and
27  Steve Fambro, helped to create the electric vehicle market in 2006 with an idea unlike
28  any other. It was first to achieve 300 mpg and it got a lot of attention, landing on



**SECOND AMENDED COMPLAINT**

the cover of dozens of magazines and even appearing in the movie *Star Trek*[,]" which established brand and product recognition.

20.    Aptera Motors, Inc. achieved these feats by focusing their efforts on designing a vehicle that combined light body weight, reduced ground friction, and most importantly, a unique aerodynamic body shape that is aesthetically striking and pleasing while permitting the vehicle to reach these levels of efficiency. Critically, that elegantly designed futuristic body shape and look—which was only achievable through the use of a proprietary combination of materials and manufacturing methods—was a critical part of the allure of the early Aptera vehicle that distinguished it, from both other options on the market at that time and other ultra efficient vehicle designs, and was an essential part of the marketability of the vehicle.

21.    Aptera achieved this through use of the proprietary blend of materials, manufacturing, and design. Aptera developed a vehicle that had a previously unmatched strength-to-weight ratio that allowed it more flexibility and fluidity in the angles and design of the vehicle to achieve the aerodynamic shape. The manufacturing method included using that proprietary blend of materials and manufacturing methods to create a "honeycomb" substructure that allowed the materials to resonate, flex, and recover from impact; so much so, that during demonstrations, Aptera executives would repeatedly hit the body of the vehicle with a two-by-four to show off its durability. According to Aptera's executives, even BMW and Tesla had expressed interest in purchasing that technology from Aptera at that time.

22.    Upon information and belief, Aptera Motors, Inc. considered all non-public aspects of its technology to be highly confidential, and took extensive measures to protect its proprietary information.  For example, Aptera Motors, Inc. obtained signed non-disclosure agreements ("NDAs") from everyone that Aptera Motors, Inc. anticipated discussing its technology with.  Indeed, Aptera Motors, Inc. kept numerous binders and boxes of signed NDAs to ensure its confidential information remained non-public.  Indeed, Aptera Motors, Inc. even obtained an NDA signed by the likes of

6

Elon Musk himself.



23.     Upon information and belief, when third-party vendors were concerned, Aptera Motors, Inc. shared only discrete subparts of information—subject to an NDA—related to its Trade Secrets so that no individual vendor would all of Aptera Motors, Inc.'s information in one place.  This practice was in place for various composite manufacturers that Aptera Motors, Inc. worked with, which pre-date the Plaintiff's purchase of Aptera Motors, Inc's assets.

24.     As another example, Aptera Motors, Inc. was careful to mark applications to the U.S. Department of Energy's Advanced Technology Vehicles Manufacturing Incentive Program a highly confidential, and expressly claimed that trade secrets were being submitted such that the information was exempt from disclosure under the Freedom of Information Act.  Documents submitted for evaluation by the U.S. Department of Energy also included markings stating "The data contained in pages [specific sections] of this document... have been submitted in confidence and contain trade secrets or proprietary information... to be used only for evaluation purposes…"[1]  And during the application process, Aptera Motors, Inc.

---

[1] There are several variations of this language across different documents, but the effect is the same.

**SECOND AMENDED COMPLAINT**

strategically omitted specific mention of its composite manufacturing partners, instead referring to them in only general terms.



25.    In its Sale of Series C Preferred Stock (Initial Closing February 4, 2008), Aptera Motors, Inc. represented to purchasers of the Company's Series C Preferred Stock that "Each employee and officer of the Company has executed a Proprietary Information and Inventions Agreement…"  Upon information and belief, Fambro, Anthony, Johnson, Hill, and Armstrong, either as officers or employees of Aptera Motors, Inc., each executed Proprietary Information and Inventions Agreements; to argue otherwise would result in Defendants effectively admitting that false information was provided in Aptera Motors, Inc.'s Sale of Series C Preferred Stock documents.

26.    Defendants Hill and Armstrong, and non-party Miles Wheeler ("Wheeler"), worked together with Anthony and Fambro during that time, coming up with the original design for the unique body design of Aptera's aerodynamic vehicles.

27.    Upon information and belief, Hill performed work for Aptera Motors,

**SECOND AMENDED COMPLAINT**

Inc. from 2006 through 2009, focusing on the interior and exterior design of Aptera Motors, Inc.'s aerodynamic vehicle.

28.    Upon information and belief, Armstrong, from 2006 through 2008, worked as a lead engineer with Hill and others to develop the body of Aptera Motors, Inc.'s aerodynamic vehicle, including the foregoing proprietary blend of materials and manufacturing method for use of those materials in developing the ultralight/strong body of the vehicle, working hand-in-hand with Hill to develop materials that would allow for the vehicle's design. In essence, the Trade Secrets Hill helped develop make the unique aerodynamic body shape of the Aptera vehicle a reality.

29.    Upon information and belief, during their time at Aptera Motors, Inc. (2006-2009), both Hill and Armstrong had access to, and knowledge of, Aptera Motors, Inc.'s confidential and proprietary information, which they both used in working on the design of Aptera Motors, Inc.'s aerodynamic vehicle.

30.    In September 2008, Aptera Motors, Inc. hired an automotive industry veteran Paul Wilbur, to take over as President and CEO.

31.    Wilbur delayed the release of Aptera's new line of vehicles based on concerns that the vehicles were not yet ready for release. In 2009, Fambro and Anthony stepped back from day-to-day operations of the company (allegedly, to save money and lower the company's "burn" rate while the company sought more funding), though they remained on as shareholders of, and advisers to, Aptera Motors, Inc.; Fambro remained a director.

32.    Thereafter, Aptera Motors, Inc. was granted two design patents, for "Aerodynamic Vehicle" and "Aerodynamic Vehicle Body", U.S. Patent Nos. D633821 (the "'821 Patent") and D635487 (the "'487 Patent"), respectively. Hill, Armstrong, and Wheeler are each listed as "Inventors" under those patents. True and correct copies of each of the '821 Patent and '487 Patent are attached hereto as **Exhibit 1** (the '821 Patent) and **Exhibit 2** (the '487 Patent), respectively.

33.    However, in the end, per Aptera Motors, Inc.'s website, "funding didn't

**SECOND AMENDED COMPLAINT**

exist for EV programs like it does today and Aptera faced challenges. Even with the support of thousands of fans around the globe, the team realized the time was not right for Aptera to fulfill its mission of creating a healthier world and a better way to travel."

34.    In 2011, Aptera Motors, Inc. elected to liquidate via a general assignment for the benefit of creditors through an otherwise well-known and reputable liquidator, Michael Maidy of Sherwood Partners.

35.    Accordingly, on or about December 5, 2011, Wilbur executed a "General Assignment" in favor of Aptera (assignment for the benefit of creditors), LLC ("Aptera ABC, LLC"), a limited liability company formed by Mr. Maidy to take assignment of the assets of Aptera Motors, Inc. (the "Assignment"). The Assignment purported to assign all of the tangible and intangible assets of Aptera Motors, Inc., including all "patents, copyrights, trademarks and trade names and all associated goodwill, source codes, software, and related documentation," and agreed to "execute such additional documents as shall be necessary to accomplish the purpose of this Assignment." Notably, the "related documentation" included confidentiality agreements and NDAs signed by Aptera Motors, Inc. employees acknowledging their obligations to maintain the secrecy of Aptera Motors, Inc.'s confidential and proprietary information.  A true and correct copy of the Assignment is attached as **Exhibit 3**.

**B. Plaintiff Purchases the Assets of Aptera Motors, Inc. out of the ABC.**

36.    In January 2012, the officers and principals of Plaintiff Zaptera met with Wilbur and a team of executives from Aptera Motors, Inc. in Carlsbad, California, to inspect the liquidation assets. During that meeting, Wilbur and the executives touted the immense value of Aptera Motors, Inc.'s patents and trade secrets.

37.    On or about April 5, 2012, Aptera ABC, LLC and Plaintiff executed an Asset Purchase Agreement (the "Asset Purchase Agreement") for the purchase of all of the assigned assets of Aptera Motors, Inc., including all of Aptera Motors, Inc.'s intellectual property rights (the "Intellectual Property") and "related documentation,"



10

for the purchase price of one million five hundred dollars ($1,500,000.00) (the "Purchase Price"). A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit 4**.

38.    Thereafter, Plaintiff paid the Purchase Price, and took possession of the Intellectual Property, including electronic files, design concepts, CAD data, notebooks, marketing documents, customer databases, and "related documentation," which included numerous boxes and binders of documents.  Plaintiff still maintains possession of numerous boxes of NDAs and confidentiality agreements Plaintiff obtained as part of the Asset Purchase Agreement. Indeed, the Asset Purchase Agreement included various exhibits, including the Assignment (Exh. A), a schedule of assets being assigned (Exh. B), an "Assignment and Bill of Sale Agreement" (Exh. C), Patent Assignment (Exh. D), and Trademark Assignment (Exh. E). *See* **Exhibit 4**.

39.    The Patent Assignment assigned the following inventions:

| Name | Patent No. | Patent Date |
|------|-----------|-------------|
| Aerodynamic Vehicle Body | D635487 | April 5, 2011 |
| Aerodynamic Vehicle | D633821 | March 19, 2010 |

(Collectively hereafter, the "Zaptera Patents").

**C. Defendants Resuscitate Aptera Motors as Aptera Motors Corp. Using the Intellectual Property They Had Sold to Plaintiff.**

40.    According to Aptera Motors, in 2019, after seeing a growing trend of more demand, better technology, improved supply chain, and electric vehicles growing more inefficient, Anthony and Fambro recognized "an opportunity . . . to build lightweight and aerodynamic vehicles powered by the sun that are able to handle most daily driving needs . . . ." In addition, Anthony, Fambro, Johnson, Hill, and Armstrong learned of Rick Derringer's ("Derringer"),  passing, which led to their belief that there was no one left to enforce Plaintiff's Intellectual Property rights.

41.    Accordingly, Anthony, Fambro, and Johnson officially relaunched Aptera Motors in March 2019, incorporating as Aptera Motors Corp. (instead of

**SECOND AMENDED COMPLAINT**

Aptera Motors, Inc.).

42.    Aptera Motors, through Anthony and Fambro, went on to hire several of the original designers and engineers responsible for Aptera's unique body design and use of materials, including Hill, Armstrong, and Wheeler, each of whom are listed as inventors on the Zaptera Patents.

43.    Indeed, it was clear to any observer that Aptera Motors Corp. was merely a resuscitation of Aptera Motors, Inc. The only difference was, Aptera Motors had now successfully used the ABC process to escape its creditors.  In fact, in a 2023 interview, Armstrong explained that Aptera Motors, Inc's "IP was bought by a gentleman in San Diego," and that "unfortunately, he passed away in 2019," resulting in "his widow phon[ing] up Chris [Anthony] and Steve [Fambro]" to ask "do you want your project back?", and them responding "Yes!".[2]

44.    Upon information and belief, Armstrong's reference to "a gentleman" was in reference to Derringer.  Derringer never owned Aptera in any way and was merely involved with the negotiation of the sale of the Intellectual Property to Plaintiff.

45.    Upon information and belief, Defendants, and each of them, discussed and believed that Derringer had authority to sell Plaintiff's Intellectual Property, and to the extent Defendants believed that, Defendants' decision to resume use of Plaintiff's Intellectual Property was willful as Defendants' belief is based on the thought that the person who could sue them, Derringer, was no longer around.

46.    Armstrong further explained that within a matter of days, in November 2019, Anthony and Fambro obtained funding to resume Aptera's development of the aerodynamic vehicle and began reaching out to former employees, including Hill, all of whom were involved with the engineering and building of the vehicle by June 2020,

---

[2] *See* https://www.youtube.com/watch?v=ziMssZZhEbg at 2:45.

**SECOND AMENDED COMPLAINT**



1  when they "got the band back together."[3]  In other words, Aptera Motors continued

2  using the exact same IP, including the Zaptera Patents and Trade Secrets, that were

3  sold to Plaintiff nearly a decade prior.  Notably, Armstrong made no mention of any

4  agreement or other consideration that was offered to Plaintiff in exchange for

5  Defendants resumed use of Plaintiff's Intellectual Property.

6      47.    Indeed, the relaunched Aptera Motors began designing vehicles that

7  looked nearly identical to the old Aptera vehicles, with only minor changes to the body

8  and exterior. While there were some changes, the distinctive aerodynamic shape of

9  the body was unmistakably that of the original Aptera designs covered by the Zaptera

10  Patents, and was intended to resemble and build off of the original patented Aptera

11  design, which had brand recognition dating back to the late 2000s.  In other words,

12  Aptera Motors intended to reengage and grow its existing fan base.

13      48.    That aerodynamic and aesthetically unique shape was critical to the

14  development, promotion, and success of Aptera Motors. Hill, as Aptera Motors' Chief

15  of Design from January 2019 through January 2025, publicly touted the aerodynamics

16  and aesthetics of the design in promoting the return of Aptera and continued

17  development of their new vehicles.  Upon information and belief, Hill led the

18  comprehensive design vision for Aptera's newest version of its aerodynamic electric

19  vehicles. Hill's work for the resuscitated Aptera Motors Corp. included (1) overseeing

20  exterior aesthetics (color, material, finish); (2) crafting the aerodynamic shape; and

21  (3) working with Armstrong on material choices to suit the shape and design, all of

22  which include work related to the subject matter covered by the Zaptera Patents and

23  Trade Secrets.  Indeed, Hill is touted as the "Vehicle Designer" of the Aptera vehicle

24  on Aptera's own website.[4]

25      49.    Upon information and belief, Aptera Motors Corp. rehired Armstrong in

26

27  [3] *See* https://www.youtube.com/watch?v=ziMssZZhEbg at 3:00.

28  [4] *See* https://aptera.us/step-inside-aptera/.



**SECOND AMENDED COMPLAINT**

1    February 2019 as its Chief Technology Officer.  Thereafter, Armstrong resumed work

2    on the aerodynamic vehicle shape that he previously worked on at Aptera Motors,

3    Inc., which is the subject matter of the Zaptera Patents, and the proprietary materials

4    blend and manufacturing methods that are the subject of the assigned Trade Secrets.

5         50.    Aptera Motors even resumed its practice of seeking to patent the various

6    elements of its vehicles.

7         51.    For instance, on March 9, 2021, Aptera Motors obtained a new design

8    patent for a "Three Wheeled Vehicle" numbered D912586 (the "'586 Patent"), which

9    names Hill, Fambro, Anthony, and Armstrong as inventors. A review of those portions

10   of the drawings make clear, the '586 Patent depicts the original Aptera vehicle that is

11   the subject of the Zaptera Patents, and only purports to patent a specific design element

12   of the rear wheel cover and shape of the very back-end of the vehicle. A true and

13   correct copy of the '586 Patent is attached hereto as **Exhibit 5**.

14        52.    Notably, in applying for the '586 Patent, Aptera Motors disclosed the

15   Zaptera Patents in their Information Disclosure Statement ("IDS"). A true and correct

16   copy of the IDS submitted by Aptera Motors to the USPTO on or about August 22,

17   2019, is attached hereto as **Exhibit 6**.

18        53.    In addition, Aptera Motors filed other new applications based on

19   technology and designs, including trade secrets, Defendants had sold to Plaintiff.

20   Aptera Motors claims to have a "$100M+ patent portfolio" with 4 issued patents and

21   30 pending patent applications. On information and belief, the "$100M+ patent

22   portfolio" was developed at least in part using Plaintiff's trade secrets, including those

23   related to the angles of the aerodynamic vehicle body that is only able to be

24   accomplished through the use of proprietary blend of materials and manufacturing

25   methods to achieve the vehicle's unique strength-to-weight ratio.  Trade secrets also

26   include information related to proprietary aerodynamic modeling and optimization,

27   design rationale, supplier networks, and battery management systems.

28        54.    During that time period, Aptera Motors used the same patented designs

**SECOND AMENDED COMPLAINT**

and trade secrets previously sold to Plaintiff through the Asset Purchase Agreement to attract preorders from future purchasers, grants from the US Department of Energy, and investments through "Reg A" private offerings, and other institutional offerings.

**D. Aptera Motors Succeeds by Infringing on Plaintiff's Intellectual Property.**

55.    Aptera Motors has apparently seen success, boasting "We launched in late 2019 and have 40,000+ reservations from customers in 100+ countries. We plan to begin production in 2024." By Aptera Motors' own admission, it has received 47,000+ pre-order reservations which represent $1.7 billion revenue when the vehicles are delivered.

56.    Indeed, Aptera Motors has raised more than one hundred million dollars from grants and investors through "Reg A" offerings.

57.    Those offerings are notable, because Aptera Motors has boasted of and identified its technology, design, and intellectual property as part of its advantage, strategy, and success in publicly available filings on the SEC's EDGAR system.

58.    For instance, at page 4 of Aptera Motors' most recent "Offering Memorandum Dated May 30, 2024" (the 2024 Offering Memorandum") filed with the SEC and available on EDGAR, Aptera Motors, includes the heading "THE COMPANY AND ITS BUSINESS." Subheadings thereunder include "Our Advantages" and "Intellectual Property," among others.

59.    Under the subheading "Our Advantages," Aptera Motors asserts "we have been able to take a new approach to developing a solar powered vehicle that is based on first-principles engineering, by focusing on weight, aerodynamics, and overall efficiency." It makes clear that weight and aerodynamics are critical to achieving "meaningful solar powered range, in excess of the average U.S. commute, and that is highly differentiated in functionality, purpose and style."

60.    And under the subheading "Intellectual Property," Aptera Motors boasts:

> We have been granted four patents, two design patents and two utility patents. We have 30 patents pending, and our



**SECOND AMENDED COMPLAINT**

patenting process is ongoing. . . . These patents cover our . . . aerodynamic shape . . . body . . . thermal management . . . . To date, we have relied on copyright, trademark and trade secret laws, as well as confidentiality procedures and licensing arrangements, to establish and protect intellectual property rights to our vehicle cooling method, process technologies and vehicle designs. We typically enter into confidentiality or license agreements with employees, consultants, consumers and vendors to control access to and distribution of technology, software, documentation and other information. Policing unauthorized use of this technology is difficult, and the steps taken may not prevent misappropriation of the technology. . . .

61.    On page seven, the 2024 Offering Memorandum then lists Aptera Motors' patents and patent applications, including the '586 Patent and the '830 Patent. A true and correct copy of the 2024 Offering Memorandum is attached hereto as **Exhibit 7**.

62.    As Aptera Motors increased its marketing efforts, it made bold claims regarding the aesthetics of the Aptera vehicle—including aesthetics covered by the Zaptera Patents—in which it expressly disclaimed the notion that the design was based only on performance.  In other words, while the design may have included features intended to benefit various features of the Aptera vehicle, the unique body design of the vehicle is also for aesthetic purposes aimed at bolstering Aptera Motors' marketing and sales.

63.    For example, in a May 24, 2025, interview with Anthony Reale of Design Impact, Hill states "And one of the things that design has done for Aptera, and indeed relates to your prior question, is the *value of excellence in design and I'm including the engineering in this like design, design engineering and the resultant, let's say aesthetic style*.  All of those things make Aptera like the value proposition of Aptera is 3x the cost and the price at least.  And that's a bold statement, but I firmly believe that there is, there's a value in all of the things that we've designed in."  Hill also

16



**SECOND AMENDED COMPLAINT**

stated, "So if we go back to the beginning, ***the core layout of the vehicle was established by the Founders***. So the influence of design is to take their vision and stick to it an incredibly stubborn manner and not to be influenced towards making it something other than what they want and what they believe in." Hill said that while the initial influence of the Morelli design played a role, "even the earliest [Aptera vehicle] sketches are ***building upon*** the basic shape." And regarding the proprietary material choice for creating the Aptera Vehicle, Hill stated, "***material choice is key because you want to reflect part of the value***."[5]

64. As another example, in a September 12, 2022, interview, Anthony stated that while other companies were improving efficiency at the expense of design aesthetics, "Aptera proves that new and exciting designs can still be made in different form factors while still achieving maximal efficiency."[6]

65. Similarly, Aptera Motors publicly acknowledges that (1) its first prototype was developed in 2009 (and featured on *Star Trek* and *Family Guy*); (2) the vehicle "design is inspired by nature and refined by science"; and (3) the "***proprietary***



4. Our first prototype made a cameo in the 2009 Star Trek movie and was animated into an episode of Family Guy.



5. Aptera's design is inspired by nature and refined by science.

6. Our proprietary composites are many times stronger than steel.

---

[5] *See* https://www.youtube.com/watch?v=TLQxMpaexIA at 6:50-12:00, 25:54-26:05.

[6] *See* https://www.teslarati.com/aptera-co-founder-chris-anthony-exclusive-interview/.

**SECOND AMENDED COMPLAINT**

composites are many times stronger than steel."[7]  As Aptera Motors admits, the Aptera vehicle was widely recognizable in popular media culture.

66.    As another example of Aptera Motors' ongoing use of Plaintiff's Intellectual Property, including the Zaptera Patents and Trade Secrets, Hill was interviewed on or around May 18, 2023, by The InEVitable podcast where he discussed the Aptera vehicle's design, structure and materials..  Specifically, during that interview, Hill (1) discussed Aptera Motors' current use of "two types of composites"; (2) described how the current Aptera vehicle "needs to stay the same" as the original; (3) stated the Aptera vehicle does not have the word "Aptera" on the vehicle "because, just, it is."[8]

67.    By November 27, 2024, Aptera Motors publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle following Aptera Motors' reemergence in 2019 and its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012.

**E. Defendants Ignore Plaintiff's Demand.**

68.    In or around early July 2022, Plaintiff discovered that Defendants had resuscitated Aptera Motors using what appeared to be the very same design covered by the Zaptera Patents.

---

[7]  *See*    https://aptera.us/7-things-real-fans-know-about-aptera/;    *see    also* https://aptera.us/the-latest-on-apteras-solar-electric-vehicle-development/ (November 9, 2021 Aptera blog post confirming that Aptera Motors "now ha[s] three ***beautiful*** solar electric vehicles as proof.")

[8] *See* https://m.youtube.com/watch?v=kgN1c5AvnRY at 1:14:30-1:19:15.

**SECOND AMENDED COMPLAINT**

69.    On July 28, 2022, through counsel at Barnes & Thornburg, LLP, Plaintiff sent a letter to Anthony and Aptera Motors, seeking to discuss Aptera Motors' unauthorized use of the Zaptera Patents, hoping to resolve the matter amicably (the "Zaptera Letter"). Indeed, Aptera Motors was using the very same designs they had sold to Plaintiff for one-and-a-half million dollars some ten years earlier, without permission, and without either paying licensing fees or repurchasing the patents from Plaintiff. The Zaptera Letter compares photos of Aptera Motors' current vehicles to the drawings on the Zaptera Patents, and then states, "the Aptera vehicle appears to infringe the Zaptera patents and any use, manufacture, sale, offer for sale, and importation of the Aptera vehicle in the United States is unauthorized and in violation of Zaptera's patent rights." A true and correct copy of the Zaptera Letter is attached hereto as **Exhibit 8**.

70.    On September 16, 2022, Plaintiff eventually received a response from an attorney representing Aptera Motors (the "Aptera Response Letter"). But that attorney only states, "I must break off communications," citing "MRPC 4.2(c)", which governs communicating with represented parties.[9] The Aptera Response Letter asserts that Idealab Holdings, LLC, is the "record owner" of the Zaptera Patents, and notes Plaintiff was in Franchise Tax Board ("FTB") suspended status at that time. However, the Aptera Response Letter does not deny that the ABC occurred, or that the Zaptera Patents were assigned during the course of the ABC. A true and correct copy of the Aptera Response Letter is attached hereto as **Exhibit 9**.

71.    Plaintiff has since been reinstated as an active California corporation, following a successful FTB revivor application.

72.    Also, Plaintiff recorded the Patent Assignment with the USPTO on July

---

[9] Presumably, the letter referred to model professional rule 4.2, though, curiously, the model rule does not have a Subsection (c). And while California's Rule of Professional Conduct 4.2 has a Subsection (c), like the rest of the rule, it does not appear to apply here, as Plaintiff was communicating through counsel.

**SECOND AMENDED COMPLAINT**



1    9, 2024. A true and correct copy of the Patent Assignment is attached hereto as

2    **Exhibit 10**.

3    73.    Since then, Plaintiff has renewed its demand on Aptera Motors, only to

4    again be ignored, necessitating this action.

5    <center>**FIRST CAUSE OF ACTION**</center>

6    <center>**(Infringement of U.S. Patent No. D633821 Against Aptera Motors, Fambro,**</center>

7    <center>**Anthony, Johnson, Hill, Armstrong, and Does 1-100)**</center>

8    74.    Plaintiff hereby alleges and incorporates by reference each and every

9    allegation set forth above, as if fully set forth herein.

10    75.    The '821 Patent is valid and enforceable.

11    76.    The '821 Patent claims a new, original, and ornamental design for an

12    aerodynamic vehicle. A side-by-side comparison below shows that Defendants have

13    misappropriated Plaintiff's patented product design in the Aptera vehicle:

| Figures from the '821 Patent | Aptera Vehicle |
|:---:|:---:|
| FIG. 1 | |
| FIG. 2 | |

**SECOND AMENDED COMPLAINT**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG. 3





FIG. 4





FIG. 5



**SECOND AMENDED COMPLAINT**

1
2
3
4
5
6
7



FIG. 6



8
9
10
11
12
13



FIG. 7



all-wheel-drive

14   77.   To an ordinary observer familiar with the relevant prior art, giving such
15   attention as a purchaser of the Aptera vehicle would usually give, the claimed design
16   of the '821 Patent and the design of the Aptera vehicle are substantially the same, such
17   that the ordinary observer would be deceived into believing that the design of the
18   Aptera vehicle is the design claimed in the '821 Patent.

19   78.   Defendants, in violation of 35 U.S.C. § 271, have directly infringed the
20   '821 Patent by making, using, offering for sale, selling, and/or importing the Aptera
21   vehicle in the United States.  Hill, as the Chief of Design, and Armstrong, as the Chief
22   Technology Officer, infringed upon the Zaptera Patents—for which Hill and
23   Armstrong are both named inventors—by resuming development of the Aptera
24   vehicle's exterior aesthetics and crafting the aerodynamic shape and materials choices.
25   By resuscitating Aptera Motors, accepting and moving forward with manufacturing
26   of vehicles using those infringing designs, Anthony, Fambro, and Johnson resumed
27   use of the Zaptera Patents by incorporating the covered subject matter into the design
28   development of the new Aptera vehicle.

**SECOND AMENDED COMPLAINT**

1    79.    Defendants' acts with respect to the Aptera vehicle have been without

2    license from Plaintiff with respect to the '821 Patent.

3    80.    Defendants, in violation of 35 U.S.C. § 289, have directly infringed and

4    continue to infringe the '821 Patent by applying the patented design of the '821 Patent,

5    or a colorable imitation thereof, to an article of manufacture, including the Aptera

6    vehicle, for the purpose of sale and/or by selling, offering, or exposing for sale an

7    article of manufacture, including the '821 Patent, to which the patented design of the

8    '821 Patent or a colorable imitation thereof has been applied.

9    81.    Plaintiff has suffered and is continuing to suffer damages as a direct and

10    proximate result of Defendant' infringement of the '821 Patent. Under 35 U.S.C. §§

11    284 and 285, Plaintiff is entitled to compensation and other monetary relief to the

12    fullest extent allowed by law, including attorneys' fees.

13    **<u>SECOND CAUSE OF ACTION</u>**

14    **(Infringement of U.S. Patent No. D635487 Against Aptera Motors, Fambro,**

15    **Anthony, Johnson, Hill, Armstrong, and Does 1-100)**

16    82.    Plaintiff hereby alleges and incorporates by reference each and every

17    allegation set forth above, as if fully set forth herein.

18    83.    The '487 Patent is valid and enforceable.

19    84.    The '487 Patent claims a new, original, and ornamental design for an

20    aerodynamic vehicle body. A side-by-side comparison below shows that Defendants

21    have misappropriated Plaintiff's patented product design in the Aptera vehicle:

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Figures from the '487 Patent | Aptera Vehicle |
|---|---|
|  FIG. 1 |  |
|  FIG. 2 |  |
|  FIG. 3 |  |

**SECOND AMENDED COMPLAINT**



FIG. 4





FIG. 5





FIG. 6



**SECOND AMENDED COMPLAINT**



FIG. 7



all-wheel-drive

85.    To an ordinary observer familiar with the relevant prior art, giving such attention as a purchaser of the Aptera vehicle would usually give, the claimed design of the '487 Patent and the design of the Aptera vehicle are substantially the same, such that the ordinary observer would be deceived into believing that the design of the Aptera vehicle is the design claimed in the '487 Patent.

86.    Defendants, in violation of 35 U.S.C. § 271, have directly infringed the '487 Patent by making, using, offering for sale, selling, and/or importing the Aptera vehicle in the United States.  Hill, as the Chief of Design, and Armstrong, as the Chief Technology Officer, infringed upon the Zaptera Patents—for which Hill and Armstrong are both named inventors—by resuming development of the Aptera vehicle's exterior aesthetics and crafting the aerodynamic shape and materials choices. By resuscitating Aptera Motors, accepting and moving forward with manufacturing of vehicles using those infringing designs, Anthony, Fambro, and Johnson resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle.

87.    Defendants' acts with respect to the Aptera vehicle have been without license from Plaintiff with respect to the '487 Patent.

88.    Defendants, in violation of 35 U.S.C. § 289, have directly infringed and continue to infringe the '487 Patent by applying the patented design of the '487 Patent, or a colorable imitation thereof, to an article of manufacture, including the Aptera vehicle, for the purpose of sale and/or by selling, offering, or exposing for sale an

**SECOND AMENDED COMPLAINT**

article of manufacture, including the '487 Patent, to which the patented design of the '487 Patent or a colorable imitation thereof has been applied.

89.    Plaintiff has suffered and is continuing to suffer damages as a direct and proximate result of Defendant' infringement of the '487 Patent. Under 35 U.S.C. §§ 284 and 285, Plaintiff is entitled to compensation and other monetary relief to the fullest extent allowed by law, including attorneys' fees.

## THIRD CAUSE OF ACTION

**(Misappropriation of Trade Secrets [18 U.S.C. 1831, et seq] Against Aptera Motors, Fambro, Anthony, Johnson, Hill, Armstrong, and Does 1-100)**

90.    Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

91.    During the time Aptera Motors, Inc. operated, it maintained various trade secrets relating to its vehicle cooling method, process technologies, blend of materials used to manufacture the body, manufacturing methods, and vehicle designs (the "Trade Secrets"). The Trade Secrets include:

    a.  Design secrets relating to the composition of materials used to build the lightweight yet incredibly strong body of the vehicle;

    b.  Manufacturing method secrets relating how to manufacture the body based on those secret designs;

    c.  Design secrets relating to the exact shape and mathematical ratios to achieve optimal aerodynamics using the vehicle's shape;

    d.  The identity of former investors in Aptera Motors, Inc.

92.    The Trade Secrets are not generally known, or readily ascertainable through reference to public sources, and were the result of vast investments of money and labor into developing them.

93.    Aptera Motors, Inc. maintained the secrecy of the Trade Secrets through use of a variety of commercially reasonable methods, including a combination of confidentiality and non-disclosure agreements with employees, consultants,



27

**SECOND AMENDED COMPLAINT**

consumers and vendors to control access to and distribution of technology, software, documentation and other information. More specifically, each of Aptera Motors, Inc.'s employees, including Anthony, Fambro, Hill, and Armstrong, were required to sign agreements including non-disclosure terms prohibiting them from copying, using, or distributing the foregoing trade secrets outside of their roles as employees of Aptera Motors, Inc. Aptera Motors, Inc. also required vendors and third-parties to sign NDAs, and marked documents submitted to the U.S. Department of Energy as exempt from the Freedom of Information Act. Additionally, Plaintiff is informed and believes Aptera Motors, Inc. restricted access to paper documentation of those trade secrets to employees who needed access to those materials, and kept that documentation under lock-and-key.

94. Aptera Motors, Inc. assigned those Trade Secrets, together with the confidentiality agreements related thereto, to Plaintiff via the Asset Purchase Agreement. *See* **Exhibit 4**. Following the assignment of the Trade Secrets, Aptera Motors, Inc. (through the ABC liquidator) delivered those secure paper files containing the documentation of the trade secrets, together with the relevant confidentiality agreement, to Zaptera. In turn, Zaptera kept original paper files for the confidentiality agreement and documentation of the trade secrets secured in a locked space, for which only one individual had key access. Moreover, digital files were kept secure by maintaining password-protected file storage servers and limiting the number of individuals with access on a "need-to-know" basis.

95. When Aptera Motors Corp. relaunched in 2019, Plaintiff was the owner of each of the Trade Secrets based on the Asset Purchase Agreement.

96. Aptera Motors, in its current iteration, has wrongfully obtained the Trade Secrets through re-hiring the very employees who had developed those Trade Secrets while employed by Aptera Motors, Inc., and who still possess knowledge of those Trade Secrets. Defendants, and each of them, improperly resumed use and/or disclosed the Trade Secrets as detailed above through improper means. Defendants'



28

1   decision to resume use of the Trade Secrets, and to disclose at least some of the Trade

2   Secrets, constitutes trade secret misappropriation.

3       97.    More specifically, Aptera Motors has wrongfully made use of the Trade

4   Secrets in advancing its own business. Indeed, Aptera Motors credits those very same

5   Trade Secrets as part of its intellectual property in its SEC filings.

6       98.    Prior to Defendants' resuscitation of Aptera Motors Corp., none of the

7   Trade Secrets were generally known or publicly available.  Moreover, the Trade

8   Secrets were subject to reasonable secrecy measures intended to preserve the

9   independent economic value of the Trade Secrets.

10      99.    And yet each of Hill and Armstrong used those very same trade secrets

11  to further the manufacture of Aptera's newest vehicle designs, which incorporate the

12  proprietary blend of materials and manufacturing methods used to manufacture the

13  original Aptera vehicles that Plaintiff acquired through the Asset Purchase Agreement.

14  In addition, Anthony and Fambro, knowing full well that those trade secrets were sold

15  to Zaptera, ratified and moved forward with the use of those same trade secrets in

16  Aptera's newest designs.

17      100.   Plaintiff was harmed, and continues to be harmed, and each of

18  Defendants were, and continue to be, unjustly enriched by the improper use and

19  disclosure of the Trade Secrets.  Defendants' acquisition, use, and disclosure of the

20  Trade Secrets was a substantial factor in causing Plaintiff's harm, and each of

21  Defendants' unjust enrichment.

22      101.   As a direct and proximate result of the foregoing misappropriation of the

23  Trade Secrets, Plaintiff has suffered damages in an amount according to proof at trial.

24      102.   Defendants' actions in misappropriating the Trade Secrets was knowing

25  and fraudulent, entitling Plaintiff to recover exemplary damages according to proof.

26

27  / / /

28  / / /

29

**SECOND AMENDED COMPLAINT**

## FOURTH CAUSE OF ACTION

**(Breach of Contract by Plaintiff Against Fambro, Anthony, Hill, and Armstrong)**

103.   Plaintiff hereby alleges and incorporates by reference each and every allegation set forth above, as if fully set forth herein.

104.   Upon information and belief, each of Fambro, Anthony, Hill, and Armstrong executed written employment contracts (regardless of whether formally titled Proprietary Information and Inventions Agreement or otherwise) with Aptera Motors, Inc., which agreement contained agreements regarding the use and non-disclosure of confidential information belonging to Aptera Motors, Inc., including the Trade Secrets (the "Confidentiality Agreement").

105.   The Confidentiality Agreements were binding, valid, and enforceable as between Aptera Motors, Inc. and each of Fambro, Anthony, Hill, and Armstrong.

106.   Aptera Motors, Inc., performed all obligations owed of them under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due.

107.   Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby each of Fambro, Anthony, Hill, and Armstrong owed Plaintiff a duty to keep that same confidential information confidential.

108.   Fambro, Anthony, Hill, and Armstrong breached the Confidentiality Agreements to the extent they used and disclosed the Trade Secrets.

109.   As a direct and proximate result of the foregoing breaches of the Confidentiality Agreements, Plaintiff has suffered damages in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION

**(Declaratory Judgment by Plaintiff Against Aptera Motors, Fambro, Anthony, Johnson, Hill, Armstrong, and Does 1-100)**

110.   Plaintiff hereby alleges and incorporates by reference each and every



**SECOND AMENDED COMPLAINT**

allegation set forth above, as if fully set forth herein.

111.   A present and actual dispute exists as between Plaintiff and Aptera Motors, Fambro, Anthony, Johnson, Hill, and Armstrong, and Does 1-100, as to who legally owns the Zaptera Patents, and whether the current iterations of Aptera Motors vehicles infringe on the Zaptera Patents. Specifically, Defendants, through counsel, dispute Plaintiff's ownership of the Zaptera Patents as a basis to challenge Plaintiff's standing to sue for patent infringement, and otherwise dispute whether Defendants' current vehicle designs are sufficiently similar to infringe on the Zaptera Patents.

112.   By this action, Plaintiff seeks a judicial declaration that it is the valid and legal owner of the Zaptera Patents and that the current iteration of Aptera Motors' vehicles infringe on the Zaptera Patents.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment in its favor and against the Defendants, and each of them, as follows:

As to the First Cause of Action:

1.   A judgment that Defendants have infringed the claimed design of U.S. Patent No. D633821;

2.   A judgment awarding Plaintiff all compensatory damages for Defendants' infringement of U.S. Patent No. D633821, and in no event less than a reasonable royalty for Defendants' acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

3.   A judgment awarding Plaintiff enhanced damages based on any infringement found to be willful, pursuant to 35 U.S.C. § 284, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

4.   A judgment awarding Plaintiff all of Defendants' profits from any article of manufacture to which the claimed design of U.S. Patent No. D633821 has been applied in an amount to be determined at trial, pursuant to 35 U.S.C. § 289;



**SECOND AMENDED COMPLAINT**

5.     A finding that this case is exceptional under 35 U.S.C. § 285;

6.     An award of all pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.     An award of reasonable attorneys' fees in connection with this action;

On the Second Cause of Action:

1.     A judgment that Defendants have infringed the claimed design of U.S. Patent No. D635487;

2.     A judgment awarding Plaintiff all compensatory damages for Defendants' infringement of U.S. Patent No. D635487, and in no event less than a reasonable royalty for Defendants' acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

3.     A judgment awarding Plaintiff enhanced damages based on any infringement found to be willful, pursuant to 35 U.S.C. § 284, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

4.     A judgment awarding Plaintiff all of Defendants' profits from any article of manufacture to which the claimed design of U.S. Patent No. D635487 has been applied in an amount to be determined at trial, pursuant to 35 U.S.C. § 289;

5.     A finding that this case is exceptional under 35 U.S.C. § 285;

6.     An award of all pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.     An award of reasonable attorneys' fees in connection with this action;

On the Third Cause of Action:

1.     For damages according to proof at trial;

2.     A permanent injunction barring Defendants from continuing to use or disclose Plaintiff's trade secrets without first obtaining permission from Plaintiff;



**SECOND AMENDED COMPLAINT**

3.  In the alternative, an equitable/reasonable royalty for the use of Plaintiff's intellectual property;

On the Fourth Cause of Action:

1.  For special and general damages according to proof at trial;

2.  For exemplary damages;

On the Fifth Cause of Action:

1.  A judicial declaration that it is the valid and legal owner of the Zaptera Patents and that the current iteration of Aptera Motors' vehicles infringe on the Zaptera Patents.

On All Causes of Action:

1.  For costs of suit;

2.  For such other and further relief the Court deems just and proper.

Dated: June 26, 2025                    **ATABEK & CO.**

*/s/ Jon A. Atabek*
Jon A. Atabek, Esq.
*(jatabek@atabekandco.com)*
Nyja A. Prior, Esq.
*(nprior@atabekandco.com)*
250 Newport Center Drive, Suite 306
Newport Beach, CA 92660
Telephone:  (949) 229-0953
Facsimile:   (213) 402-3413

Dated: June 26, 2025                    **MORROW NI, LLP**

*/s/ Xinlin L. Morrow*
Xinlin L. Morrow, Esq.
*(xinlin@moni.law)*
3333 Michelson Dr, Ste 300,
Irvine, CA 92612-1683
Telephone:  213-282-8166

Attorneys for Plaintiff,
ZAPTERA USA, INC.

33



**SECOND AMENDED COMPLAINT**

1

## <u>JURY DEMAND</u>

2  Plaintiff hereby demands a trial by jury on all claims triable to a jury.

3 Dated: June 26, 2025    **ATABEK & CO.**

4            */s/ Jon A. Atabek*

5             Jon A. Atabek, Esq.
             *(jatabek@atabekandco.com)*

6             Nyja A. Prior, Esq.

7             *(nprior@atabekandco.com)*
             250 Newport Center Drive, Suite 306

8             Newport Beach, CA 92660

9             Telephone:  (949) 229-0953
             Facsimile:   (213) 402-3413

10

11

12 Dated: June 26, 2025    **MORROW NI, LLP**

13            */s/ Xinlin L. Morrow*

14             Xinlin L. Morrow, Esq.
             *(xinlin@moni.law)*

15             3333 Michelson Dr, Ste 300,

16             Irvine, CA 92612-1683
             Telephone:  213-282-8166

17

18             Attorneys for Plaintiff,
             ZAPTERA USA, INC.

19

20

21

22

23

24

25

26

27

28



**JURY DEMAND**