Jon A. Atabek, Esq. (Cal. SBN 269497)
    *(jatabek@atabekandco.com)*
Nyja A. Prior, Esq. (Cal. SBN 342948)
    *(nprior@atabekandco.com)*
**ATABEK & CO.**
250 Newport Center Drive, Suite 306
Newport Beach, CA 92660
Telephone:  (949) 229-0953
Facsimile:   (213) 402-3413

Xinlin Li Morrow, Esq. (Cal. SBN 281707)
    *(xinlin@moni.law)*
**MORROW NI LLP**
3333 Michelson Dr, Ste 300,
Irvine, CA 92612-1683
Telephone:  213-282-8166

Attorneys for Plaintiff ZAPTERA USA, INC.

# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZAPTERA USA, INC., a California corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>APTERA MOTORS CORP., a Delaware corporation; STEVE FAMBRO, an individual; CHRIS ANTHONY, an individual; MICHAEL JOHNSON, an individual; JASON HILL, an individual; NATHAN ARMSTRONG, an individual; APTERA (ASSIGNMENT FOR THE BENEFIT OF CREDITORS), LLC, a California Limited Liability Company; and DOES 1 through 100, inclusive,<br><br>    Defendants. | Case No.: 3:24-cv-1413-JO-JLB<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date: September 4, 2025<br>Time: 9:30 a.m.<br>Courtroom: 4C (4th Fl.)<br><br>Judge: Hon. Jinsook Ohta<br><br>Action Filed: August 8, 2024 |

Plaintiff ZAPTERA USA, INC. ("Zaptera" or "Plaintiff") hereby submits this Opposition to the Motion to Dismiss ("Motion") filed by APTERA MOTORS CORP. ("Aptera Motors"), STEVE FRAMBRO ("Fambro"), CHRIS ANTHONY ("Anthony"), MICHAEL JOHNSON ("Johnson"), JASON HILL ("Hill"), and NATHAN ARMSTRONG ("Armstrong") (collectively, "Defendants") as to Plaintiff's Second Amended Complaint ("SAC"), and states as follows:



i

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................. 0

II.    PROCEDURAL POSTURE ................................................. 1

III.    LEGAL STANDARD ........................................................ 1

IV.    ARGUMENT .................................................................... 2

A.    Zaptera Adequately States its Claims Against Each Individual Defendant...... 2

1.    Patent Infringement.......................................................... 2

(a) Officers are Personally Liable for their own Infringing Acts..................... 3

(b) The SAC Plausibly Alleges the Individual Defendant's Acts of
Infringement.................................................................. 4

2.    Trade Secret Misappropriation ...................................... 6

3.    Breach of Contract ........................................................ 10

B.    The SAC Adequately Alleges a Claim for Trade Secret Misappropriation. .. 11

1.    The SAC Identifies the Trade Secrets with Sufficient Particularity............ 12

2.    The SAC Sufficiently Alleges that Zaptera took Reasonable Measures to
Maintain the Secrecy of the Trade Secrets........................................... 19

3.    The SAC Sufficiently Alleges that Aptera's and the Individual Defendants'
Actions Constitute Clear Misappropriation.......................................... 20

C.    The SAC Adequately Alleges Zaptera's Breach of Contract Claim............... 22

1.    Zaptera Pleads an Enforceable Agreement that Defendants Breached. ...... 22

2.    Zaptera Pleads that it Obtained Ownership of the Contract Rights with Each
Defendant through the Asset Purchase Agreement................................... 23

D.    In the Alternative, Any Dismissal Should be Without Prejudice to Afford
Plaintiff an Opportunity to Amend to Cure Any Perceived Deficiencies. ............ 23

V.    CONCLUSION ................................................................. 24



**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1

## TABLE OF AUTHORITIES

**Cases**                                                                                                       **Pages**

*Abbvie Inc. v. Adcentrx Therapeutics Inc.*
 2024 WL 3611144, (S.D. Cal. July 29, 2024)................................................... 17

*Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868  (N.D. Cal. 2018) .......... 14

*Amgen Inc. v. Cal. Corr. Health Care Servs.*, 47 Cal. App. 5th 716 (2020)............. 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................... 2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 2

*Bladeroom Grp. Ltd. v. Facebook, Inc.*
 2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) ........................................................ 20

*Dairy, Ltd. Liab. Co. v. Milk Moovement, Inc.*
 2022 WL 1103822 (E.D. Cal. Apr. 13, 2022) ....................................................... 15

*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244 (1968) ............................................ 15

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .................. 25

*Farhang v. Indian Inst. of Tech., Kharagpur*
 2010 WL 2228936, (N.D. Cal. 2010)............................................................... 15, 17

*Gautier v. General Tel. Co.*, 234 Cal. App. 2d 302 (1965)................................. 11, 23

*Hum. Longevity, Inc. v. J. Craig Venter Inst., Inc.*
 2018 WL 6617633 (S.D. Cal. Dec. 18, 2018) ....................................................... 22

*Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998)................... 12, 19

*Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020)..... 13, 14

*Jones v. Lapina,* 450 F. App'x 105 (3d Cir. 2011)..................................................... 3

*Lubby Holdings LLC v. Chung*, 11 F.4th 1355 (Fed. Cir. 2021)............................ 3, 4

*MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012) ...... 12

*Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480 (9th Cir. 2019)......................... 3

*P2i Ltd. v. Favored Tech USA Corp.*, 2024 WL 4294652 ....................................... 16

*Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983 (S.D. Cal. 2012)....... 13, 17, 19

*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368 ................................................ 22

iii



**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

*Ramirez v. GMAC Mortg.*, 2010 WL 148167 (C.D. Cal. Jan. 12, 2010) .................. 23

*Resh Inc. v. Conrad,* 2024 WL 4177944 (N.D. Cal. Sept. 11, 2024).......................... 4

*Sanho Corp. v. Intelliarmor*, 2020 WL 6153265 (C.D. Cal. Sept. 25, 2020) ............. 5

*SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176 (S.D. Cal. 2012)................ 7

*Speech Tech. Assocs. v. Adaptive Commc'n Sys.*
1994 WL 449032 (N.D. Cal. Aug. 16, 1994) ............................................................ 7

*Teradata Corp. v. SAP SE*, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) .............. 17

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*
587 F.3d 1339 (Fed. Cir. 2009) ..................................................................... 19, 20

*Upstream Holdings, LLC v. Brekunitch*
2022 WL 19296350 (C.D. Cal. Sept. 30, 2022) ........................................................ 4

*Veronica Foods Co. v. Ecklin*, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ......... 22

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*
609 F.3d 1308 (Fed. Cir. 2010) ................................................................................ 4

**Statutes**

18 U.S.C. § 1839(3)............................................................................................... 12

35 U.S.C. § 271.......................................................................................................... 5

Fed. R. Civ. P. 15(a) .............................................................................................. 25

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 2

Fed. R. Civ. P. 9........................................................................................................ 3

Rest.3d Unfair Competition, § 40........................................................................... 22



**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## I.    <u>INTRODUCTION</u>

Plaintiff bought valuable intellectual property ("IP") from Aptera I, only to have the founders of Aptera I start Aptera II using that same IP a decade later, leading to this suit. Plaintiff's claims have already survived one Motion to Dismiss. The Court held that Plaintiff adequately alleged its design patent infringement claim against Aptera Motors, but that Plaintiff should augment its factual allegations to better allege individual conduct by Individual Defendants, efforts taken by Plaintiff to protect their putative trade secrets, and more detail regarding the trade secrets being protected.

The SAC does precisely that. It alleges the positions held by the Individual Defendants and the specific roles they played in exploiting Plaintiff's design patents and trade secrets. For instance, it alleges Hill knowingly and intentionally carried over the original aesthetic design (and quotes his public admissions to the same) and that Armstrong did the same by helping to carry forward the proprietary materials and manufacturing methods needed to achieve that design. Moreover, the SAC alleges Defendants did so after they learned that one of the individuals involved in purchasing the IP had died, thinking nobody was left to enforce any rights regarding the IP.

The SAC also alleges Aptera I had taken extensive efforts to protect its trade secrets through use of internal and external confidentiality agreements, segmented disclosure to avoid giving a complete picture of its trade secrets to any one vendor, and both physical and digital security measures to protect the same.

The Motion also complains that the SAC fails to attach confidentiality agreements signed by each of the natural Defendants. But contracts may be alleged by their legal effect without attaching them—particularly where one of the Defendants has stated under oath in public securities filings that such confidentiality agreements exist. Thus, Plaintiff adequately alleges the existence of the contracts at issue.

Finally, the Motion argues that the purchase agreement attached to the SAC does not include an assignment of the confidentiality agreements as a listed asset being transferred. But the attached purchase agreement assigns not only the IP of Aptera I,



**PROOF OF SERVICE**

but also the corresponding documentation to Plaintiff. Thus, the SAC more-than-adequately alleges Plaintiff's ownership of those contract rights as against Defendants.

For the foregoing reasons, the Motion should be DENIED in its entirety.

## II.    PROCEDURAL POSTURE

Defendants' first Motion to Dismiss in this action was denied in part and granted in part with leave to amend. On June 2, 2025, the Court denied Defendants' motion seeking dismissal of Zaptera's patent claims (first and second causes of action), but granted dismissal of Zaptera's claims against Defendants for trade secret misappropriation and declaratory judgment with leave to amend. Dkt. 34. The Court granted Plaintiff leave to amend the allegations against the Individual Defendants. *Id.*

Notably, during the May 29, 2025 hearing, the Court found that Zaptera needed to amend its allegations as to (1) the involvement of the Individual Defendants (for all causes of action); and (2) the trade secret cause of action related to measures taken to maintain secrecy, misappropriation activity, and what Zaptera purchased in the Asset Purchase Agreement. May 29, 2025 Hr'g. Tr. ("Hr'g. Tr.") 10:16-23, 15:1-16:9. As shown in the redline comparison of the First Amended Complaint to the SAC, Zaptera has made significant and substantial revisions to address the Court's concerns regarding the adequacy of Plaintiff's pleadings. *See* Mot., Lanham Decl., Ex. 1.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To "state a claim to relief that is plausible on its face," courts must determine whether the complaint sets forth sufficient factual matter, which must be accepted as true and viewed in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

PROOF OF SERVICE

When considering a Rule 12(b)(6) motion to dismiss, courts consider the complaint in its entirety, documents incorporated by reference, and matters of which a court may take judicial notice. *See Jones v. Lapina,* 450 F. App'x 105, 108 (3d Cir. 2011). "Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9, … the pleader is not required to allege facts that are peculiarly within the opposing party's knowledge, and allegations based on information and belief may suffice, so long as the allegations are accompanied by a statement of facts upon which the belief is founded." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493-94 (9th Cir. 2019) (internal quotations and citations omitted).

## IV.    <u>ARGUMENT</u>

### A. <u>Zaptera Adequately States its Claims Against Each Individual Defendant.</u>

Defendants conclusively state "Zaptera's amended pleading, in large part, simply continues to list defendants in an undifferentiated mass of generic allegations" and "does not show that they engaged in actionable conduct." Mot. 15. Such statements are demonstrably false, as clearly shown in Appendix 1 identifying each of the SAC's allegations against the Individual Defendants. Additionally, Defendants argue that they "independently developed since 2019" the Aptera sEV, which Defendants contend "is fundamentally different from the 2006-era knowledge implemented by the defunct Aptera Motors, Inc. entity." *Id.*, 3. This is also false, according to public statements made by the Individual Defendants themselves. Both Federal and California law holds individuals liable for their direct involvement in wrongful acts, including infringement, even when acting on behalf of a corporation. *Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1358-59 (Fed. Cir. 2021); *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 93 Cal. Rptr. 2d 663, 671 (Ct. App. 2000).

### 1. Patent Infringement

Defendants seek dismissal of the infringement claims against the Individual Defendants by incorrectly arguing that corporate officers cannot be personally liable absent alter ego allegations and that the SAC provides only conclusory assertions.



1  Neither argument withstands scrutiny. Courts have made clear that corporate officers

2  are directly liable for their own acts of patent infringement, even if performed in their

3  corporate capacity. Likewise, the SAC sets forth detailed factual allegations showing

4  how each Individual Defendant personally participated in the infringing conduct.

5      **(a) Officers are Personally Liable for their own Infringing Acts.**

6      Defendants' motion relies on what the Federal Circuit has described as a district

7  court's overly broad reading[1] of *Wordtech Sys., Inc. v. Integrated Networks Solutions,*

8  *Inc.*, 609 F.3d 1308 (Fed. Cir. 2010) to argue that alter ego allegations are required

9  before any personal liability can be imposed on the individual defendants. *See*

10 *Upstream Holdings, LLC v. Brekunitch*, No. 222CV03513MCSRAO, 2022 WL

11 19296350, at *1 (C.D. Cal. Sept. 30, 2022). *Id.* That overbroad reading of *Worldtech*

12 and Defendants' argument were expressly rejected in *Lubby Holdings*, 11 F.4th 1355.

13 The Federal Circuit explained that while veil-piercing is required for *derivative*

14 *liability*, it is not required to hold officers liable for *their own acts of direct*

15 *infringement*: "[C]orporate officers can be personally liable for their own acts of

16 infringement, even if those acts were committed in their corporate capacity. … The

17 fact that [an officer] acted on behalf of his corporation does not excuse him from

18 individual liability." *Id.*, 1358–59. Defendants cited *Resh Inc.*, which similarly held:

19 "Veil-piercing standards do not govern the separate issue of direct liability for one's

20 own wrongful acts … The fact that [the officer] may have acted on behalf of his

21 corporation does not excuse him from individual liability." *Resh Inc. v. Conrad*, No.

22 22-cv-01427-EJD, 2024 WL 4177944, at *8 (N.D. Cal. Sept. 11, 2024) (internal

23 quotations omitted) (denying motion to dismiss).

24     Defendants' reliance on *Sanho Corp. v. Intelliarmor* does not change this

25 framework; that case is readily distinguishable. In *Sanho*, the complaint alleged only

26 that the CEO "authorized and directed the infringing conduct" and "operated" a

27

28 ----
[1] In *Upstream*, the court interpreted *Wordtech* broadly without much analysis. *See Upstream*, 2022 WL 19296350, at *1.

**PROOF OF SERVICE**

suspended company while it was "selling the infringing products." *Sanho Corp. v. Intelliarmor*, No. 820CV00735JLSDFM, 2020 WL 6153265, at *5 (C.D. Cal. Sept. 25, 2020). There were no factual allegations describing personal acts of infringement—no allegations of making, offering to sell, or selling the accused products or using the patented invention to design and make the accused products.

By contrast, the SAC specifically alleges that each Individual Defendant personally designed, approved, implemented, and/or used the infringing patented designs. Accordingly, the individual defendants can be held liable under 35 U.S.C. § 271 for their own infringing conduct, regardless of their corporate titles.

### (b) The SAC Plausibly Alleges the Individual Defendant's Acts of Infringement.

Defendants contend that the SAC merely recites conclusory allegations against all individual defendants. This mischaracterizes the complaint. The SAC pleads concrete, individualized facts regarding each defendant's personal participation:

Nathan Armstrong (Chief Technology Officer): Armstrong worked with Hill on "material choices to suit the shape and design, all of which include work related to the subject matter covered by the Zaptera Patents and Trade Secrets." SAC, ¶ 48. He personally "resumed work on the aerodynamic vehicle shape … which is the subject matter of the Zaptera Patents." *Id.*, ¶ 49. He "resum[ed] development of the Aptera vehicle's exterior aesthetics and crafting the aerodynamic shape and material choices." *Id.*, ¶¶ 78, 86. He was also "involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle." *Id.*, ¶ 67. Armstrong's role in directly developing and implementing the infringing vehicle design using the Zpatera Patents easily satisfies the pleading standard.

Chris Anthony (Co-Founder): Anthony was "involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle." SAC ¶ 67. He also "resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle." *Id.*, ¶¶ 78, 86. These allegations tie Anthony directly to at least using the patented invention in violation of section 271.

<u>Steve Fambro (Co-Founder)</u>: The SAC alleges that Fambro was "involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle." SAC, ¶ 67. He also "resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle." *Id.*, ¶¶ 78, 86. Moreover, Fambro had knowledge of the NDAs and transfer of assets to Zaptera in his role as a director, thereby constituting willful infringement. *Id.*, ¶¶ 31, 37. Again, these are direct acts of infringement and go beyond mere corporate oversight.

<u>Jason Hill (Chief of Design)</u>: Hill's role is even more direct. The SAC alleges that as Chief of Design, Hill "led the comprehensive design vision for Aptera's newest version of its aerodynamic electric vehicles," including "overseeing exterior aesthetics … crafting the aerodynamic shape … and working with Armstrong on material choices to suit the shape and design, all of which include work related to the subject matter covered by the Zaptera Patents and Trade Secrets." SAC, ¶ 48. He was "involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle." *Id.*, ¶ 67. He "resum[ed] development of the Aptera vehicle's exterior aesthetics and crafting the aerodynamic shape and material choices." *Id.*, ¶¶ 78 and 86. These allegations sufficiently describe Hill's personal acts in making the infringing product and using the patented invention under section 271.

<u>Michael Johnson (Co-Founder)</u>: Johnson was "involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle." SAC, ¶ 67. Further, he "resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle. *Id.* ¶¶ 78, 86. These allegations describe Johnson's affirmative, personal act of at least "using" the "patented invention" under section 271.

The foregoing individual acts are enough to plead personal liability. Because corporate status does not shield individuals from liability for their own wrongful acts, and because Zaptera's allegations meet the applicable pleading standards, the Court should deny the Motion to dismiss as to the Individual Defendants.

## 2. Trade Secret Misappropriation

Zaptera addresses its allegations of Trade Secret misappropriation against all Defendants below, but specifically addresses Defendants' arguments regarding the Individual Defendants here. To prevail on a claim for misappropriation of trade secrets, a plaintiff must prove: (1) the plaintiff possessed a trade secrets; (2) that the defendant misappropriated the trade secret through acquisition, disclosure, or use; and (3) that the misappropriation caused or threatened damage to the plaintiff. 18 U.S.C. § 1839(5). "[I]nformation may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012); *see also Speech Tech. Assocs. v. Adaptive Commc'n Sys.*, 1994 U.S. Dist. LEXIS 11660, 1994 WL 449032 at 10 (N.D. Cal. Aug. 16, 1994) (finding misappropriation where some of the technology used in the offending new products was different from that claimed in the trade secret, but most of the functional aspects of the trade secret technology were incorporated). Zaptera has met its pleading obligations.

<u>Nathan Armstrong (Chief Technology Officer)</u>: Armstrong signed a Proprietary Information and Inventions Agreement for Aptera I. SAC, ¶ 25. Armstrong worked with Anthony and Fambro at Aptera I as a lead engineer from 2006 to 2008, where Armstrong helped come up with the original body design of the Aptera vehicle, including the proprietary blend of materials and manufacturing method for use of those materials in developing the ultralight/strong body of the vehicle. *Id.* ¶¶ 26, 28. While at Aptera I, Armstrong had access to and knowledge of Aptera I's confidential and proprietary information that was later sold to Zaptera through the Asset Purchase Agreement. *Id.* ¶ 29. Following the passing of Derringer, the SAC alleges that Armstrong believed no one else was around to enforce Zaptera's rights, which resulted in the launch of Aptera II. *Id.* ¶¶ 40-41. Aptera II then rehired Armstrong as Chief Technology Officer, and Armstrong made public comments confirming that the Zaptera IP was supposedly offered back to Aptera II (under false pretenses). *Id.* ¶¶ 42-

45. The SAC alleges that Aptera II "got the band back together", and that they each continued using the exact same IP, including the Trade Secrets, to continue developing the Aptera vehicle. *Id.* ¶ 46. While at Aptera II, Armstrong worked with Hill on material choices to suit the shape and design of the Aptera II vehicle, which including work related to the subject matter covered by the Zaptera Trade Secrets. *Id.* ¶¶ 48-49. Armstrong was involved in the use and ratification of use of Zaptera's Trade Secrets, and used the Zaptera trade secrets to manufacture Aptera II's newest vehicle designs, which incorporate the proprietary blend of materials and manufacturing methods used to manufacture the original Aptera I vehicles. *Id.* ¶¶ 67, 99.

Chris Anthony (Co-Founder): Anthony signed a Proprietary Information and Inventions Agreement for Aptera I. *Id.* ¶ 25. Anthony worked with Hill, Armstrong, Wheeler, and Fambro to come up with the original design for the unique body design of Aptera I's aerodynamic vehicles. *Id.* ¶ 26. He contributed to Aptera II's decision to get "the band back together" after securing funding to continue developing the Aptera vehicle, and by rehiring the original designers and engineers of the Aptera vehicle after Derringer's passing. *Id.* ¶¶ 40-42, 46. On or around September 12, 2022, Anthony, emphasizing the unique Aptera vehicle design (which included the Trade Secrets), stated that while other companies were improving efficiency at the expense of design aesthetics, "Aptera proves that new and exciting designs can still be made in different form factors while still achieving maximal efficiency." *Id.* ¶ 64. Anthony was involved in Aptera II's use and ratification of use of the Zaptera Trade Secrets in the aerodynamic vehicle. *Id.* ¶ 67. By resuscitating Aptera I as Aptera II, accepting and moving forward with manufacturing vehicles using designs infringing the Zaptera Patents, Anthony resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle. *Id.* ¶¶ 78, 86.

Steve Fambro (Co-Founder): Fambro was a founder of Aptera I and signed a Proprietary Information and Inventions Agreement that prevented public disclosure and use of the assets Zaptera obtained through the Asset Purchase Agreement, and



ensured others signed NDAS (and said as much in SEC filings). SAC ¶¶ 18-19, 25. Following the passing of Derringer, the SAC alleges that Fambro believed no one else was around to enforce Zaptera's rights, which resulted in the launch of Aptera II. *Id.* ¶¶ 40-41. Fambro was involved in the decision-making process to rehire several of the original designers and engineers responsible for Aptera's unique body design and use of materials, including Hill, Armstrong, and Wheeler, each of whom are listed as inventors on the Zaptera Patents. *Id.* ¶ 42. By November 2024, the SAC alleges that Aptera II's public announcements were based, at least in part, on Plaintiff's IP used to develop the Aptera vehicle, and that Fambro is or was involved in the continued development of the aerodynamic vehicle. *Id.* ¶ 67; *see also id.* ¶ 51 (stating that Fambro is a named inventor on an Aptera II patent based on the Zaptera Patents).

Jason Hill (Chief of Design): Hill signed a Proprietary Information and Inventions Agreement for Aptera I, and worked with Armstrong, Anthony and Fambro at Aptera I to come up with the original body design of the Aptera aerodynamic vehicle from 2006-2009, which included developing the proprietary blend of materials and manufacturing method for use of those materials in developing the ultralight/strong body of the vehicle. *Id.* ¶¶ 25-28. While at Aptera I, he had access to, and knowledge of, Aptera I's confidential and proprietary information that Zaptera acquired through the Asset Purchase Agreement. *Id.* ¶ 29. Following the passing of Derringer, the SAC alleges that Hill believed no one else was around to enforce Zaptera's rights, which resulted in the launch of Aptera II. *Id.* ¶¶ 40-41. Aptera II rehired Hill a Chief of Design, a role Hill stayed in from January 2019 through 2025. *Id.* ¶ 48. During that time, Hill publicly touted the aerodynamics and aesthetics of the design in promoting the return of Aptera and continued development of their new vehicles. *Id.* The SAC alleges that Hill led the comprehensive design vision for Aptera's newest version of its aerodynamic electric vehicles, which included (1) overseeing exterior aesthetics (color, material, finish); (2) crafting the aerodynamic shape; and (3) working with Armstrong on material choices to suit the shape and



design, all of which include work related to the subject matter covered by the Zaptera Patents and Trade Secrets. *Id.* Hill is touted as the "Vehicle Designer" of the Aptera vehicle on Aptera's own website. *Id.* In a publicly available May 2025 interview, Hill made various comments regarding how the Aptera II vehicle was based on, and "building upon" the Aptera I vehicle, expressly stating, "So if we go back to the beginning, *the core layout of the vehicle was established by the Founders*. So *the influence of design is to take their vision and stick to it an incredibly stubborn manner and not to be influenced towards making it something other than what they want and what they believe in*." *Id.* ¶ 63. In a May 2023 interview, Hill made similar comments where he (1) discussed Aptera Motors' current use of "two types of composites"; (2) described how the current Aptera vehicle "needs to stay the same" as the original; (3) stated the Aptera vehicle does not have the word "Aptera" on the vehicle "because, just, it is." *Id.* ¶ 66. By November 2024, the SAC alleges Aptera II's public announcements were based, at least in part, on Plaintiff's IP used to develop the Aptera vehicle, and that Hill is or was involved in the continued development of the aerodynamic vehicle. *Id.* ¶ 67. Even more specifically, the SAC alleges that Hill used the Zaptera Trade Secrets to manufacture Aptera II's newest vehicle designs, which incorporate the proprietary blend of materials and manufacturing methods used to manufacture the original Aptera I vehicles. *Id.* ¶ 99.

Michael Johnson (Co-Founder): Johnson was a founder of Aptera I and signed a Proprietary Information and Inventions Agreement that prevented public disclosure and use of the assets Zaptera obtained through the Asset Purchase Agreement. SAC ¶¶ 18-19, 25. Following the passing of Derringer, the SAC alleges that Johnson believed no one else was around to enforce Zaptera's rights, which resulted in the launch of Aptera II. *Id.* ¶¶ 40-41. By November 2024, the SAC alleges that Aptera II's public announcements were based, at least in part, on Plaintiff's IP used to develop the Aptera vehicle, and that Johnson is or was involved in the continued development of the aerodynamic vehicle. *Id.* ¶ 67.

Thus, without even addressing the allegations directed towards all Defendants (discussed below), the SAC alleges that Armstrong, Anthony, Fambro, Hill and Johnson, each had possession of the Trade Secrets, misappropriated them by resuming use through the relaunch of Aptera II, and that Plaintiff has been harmed as a result.

### 3. Breach of Contract

Defendants argue that the SAC does not state a claim for breach of contract against Armstrong, Anthony, Fambro, or Hill based on Defendants' contention that the SAC does not identify an enforceable contract or describe the substance of the relevant terms. Mot. 18-22. Defendants are incorrect. To state a claim for breach of contract, a plaintiff must plead "the contract, plaintiffs' performance (or excuse for nonperformance), defendant's breach, and damage to plaintiff therefrom." *Gautier v. General Tel. Co.*, 234 Cal. App. 2d 302, 305 (1965). Here, Zaptera has alleged that each of Armstrong, Anthony, Fambro, and Hill signed Aptera I's Proprietary Information and Inventions Agreement, as well as agreements including non-disclosure **terms** prohibiting them from copying, using, or distributing the Trade Secrets outside of their roles as employees of Aptera I. SAC ¶¶ 25, 93. Notably, Defendants do not appear to deny this fact.

The SAC further alleges that Armstrong, Anthony, Fambro, and Hill each had access to, and knowledge of, Aptera I's confidential and proprietary information, which they all used in working on the design of the Aptera I aerodynamic vehicle, and resumed said use while working for Aptera II. *Id.* ¶¶ 29, 67. The SAC expressly alleges that each of Armstrong's, Anthony's, Fambro's, and Hill's Confidentiality Agreements were binding, valid, and enforceable as between Aptera I and Armstrong. *Id.* ¶¶ 104-05. Aptera I performed all obligations owed of it under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due. *Id.* ¶ 106. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby each of Fambro, Anothony, Hill, and Armstrong owed Plaintiff a duty to keep that same confidential information

1  confidential. *Id.* ¶ 107. Fambro, Anothony, Hill, and Armstrong breached their

2  respective Confidentiality Agreements to the extent they used and disclosed the Trade

3  Secrets while advancing the interests of Aptera II. *Id.* ¶ 108.

4  **B.  <u>The SAC Adequately Alleges a Claim for Trade Secret Misappropriation.</u>**

5  The Court stated that Zaptera did not sufficiently "plead the measures taken to

6  maintain the secrecy of its alleged trade secret" and granted Zaptera leave to amend.

7  Hr'g. Tr. at 10:16-23. The Court further stated it "did not particularly find convincing

8  any other arguments as to the inadequacy of these … pleadings," but ultimately asked

9  that Zaptera add more specificity regarding the alleged misappropriation activity and

10  what Zaptera purchased in the Asset Purchase Agreement, noting that the pleadings

11  would tentatively not "require much more." *Id.*, 10:24-11:1, 15:1-16:9. Zaptera made

12  significant and substantial revisions to its pleadings, as reflected in the SAC and

13  described in specific detail below. Zaptera's revisions show that Defendants'

14  argument that "these edits confirm that Zaptera has no factual basis to allege that it

15  owns information that is both secret and that has been misappropriated by any

16  defendant" is demonstrably false. Mot. 3-4.

17  At the pleading stage, a plaintiff alleging a trade secret misappropriation claim

18  "must identify the trade secret with sufficient particularity to give defendants

19  reasonable notice of the issues which must be met at the time of trial and to provide

20  reasonable guidance in ascertaining the scope of appropriate discovery."

21  *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1113 (N.D. Cal. 2012)

22  (internal quotations omitted); *see also Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d

23  1161, 1164 (9th Cir. 1998). However, the "complaint need not spell out the details of

24  the trade secret" at the pleading stage. *MedioStream*, 869 F. Supp. 2d at 1113 (internal

25  quotations omitted). A plaintiff must also plead sufficient facts indicating that the

26  plaintiff "has taken reasonable measures to keep such information secret." 18 U.S.C.

27  § 1839(3). And finally, a plaintiff alleging trade secret misappropriation must

28  plausibly allege facts that one or more defendants engaged in misappropriation. *See*

**PROOF OF SERVICE**

1  *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012). The SAC

2  meets these established pleading requirements.

3    **1. The SAC Identifies the Trade Secrets with Sufficient Particularity.**

4    Defendants argue "Zaptera's trade secret pleadings are unclear" and appear "to

5  assert five generalized categories of information—none of which satisfies the

6  minimum pleading requirements[.]" Mot. 5. In support of this contention, the Motion

7  cites various short excerpts from several cases—all without analogizing how the

8  pleadings in those cases are purportedly similar to the SAC—and argues that the SAC

9  does not add enough relevant allegations. *See generally*, *id.*, 5-8 (listing string

10 citations quoting short buzz phrases without specifying how the pleadings are

11 comparable to the SAC). Defendants' arguments fail, as Zaptera has sufficiently plead

12 its misappropriation claim with the requisite particularity.

13    The SAC specifically identifies Trade Secrets as relating to the sEV's "cooling

14 method, process technologies, blend of materials used to manufacture the body,

15 manufacturing methods, and vehicle designs," including: (a) Design secrets relating

16 to the composition of materials used to build the lightweight yet incredibly strong

17 body of the vehicle; (b) Manufacturing method secrets relating how to manufacture

18 the body based on those secret designs; and (c) Design secrets relating to the exact

19 shape and mathematical ratios to achieve optimal aerodynamics using the vehicle's

20 shape. Dkt. 36, SAC ¶ 91.[2] Each Trade Secret is sufficiently plead, even though

21 Zaptera must only "identify at least one trade secret with sufficient particularity to

22 create a triable issue." *Inteliclear*, 978 F.3d at 659.

23 

24 [2] Defendants argue that the language preceding Trade Secrets (a-d) "is evidently
intended to serve as an amalgam of the other supposed trade secrets discussed above."

25 Mot. 8. In making this argument, Defendants conveniently omit the fact that this

26 statement ***precedes*** the specific Trade Secrets. Dkt. 36, SAC ¶ 91. Defendants' intent
in making this statement is unclear, as they offer no explanation as to why this

27 prefatory statement would not be included in the identification of the Trade Secrets

28 that immediately follow the statement. Regardless, Zaptera's Opposition thoroughly
explains how the SAC identifies each Trade Secret with sufficient particularity.

1    Along with the stated Trade Secrets, the SAC expands further by alleging (1)
2    the composition of materials and proprietary honeycomb structure is what allowed the
3    vehicle to reach heightened levels of efficiency given the design of the vehicle with a
4    "previously unmatched strength-to-weight ratio that allowed it more flexibility and
5    fluidity in the angles and design of the vehicle to achieve the aerodynamic shape" (*id.*
6    ¶¶ 20-21); (2) the "proprietary blend of materials and manufacturing method" allowed
7    for the development of "the ultralight/strong body of the vehicle" (*id.* ¶ 28); and (3)
8    "the angles of the aerodynamic vehicle body … is only able to be accomplished
9    through the use of proprietary blend of materials and manufacturing methods to
10   achieve the vehicle's unique strength-to-weight ratio" (*id.* ¶ 53).

11   Established case law has held that similar pleadings were sufficient in
12   identifying a trade secret with the requisite particularity. The Ninth Circuit previously
13   held that, where a trade secret was described as plaintiff's "unique design and concepts
14   and unique software, formulas, processes, programs, tools, techniques, tables, fields,
15   functionality, and logic by which its components interrelate and process data[,]"
16   plaintiff "identified aspects of its database logic and architecture with enough
17   specificity to create a triable issue of fact." *Inteliclear, LLC v. ETC Glob. Holdings,*
18   *Inc.*, 978 F.3d 653, 658-59 (9th Cir. 2020). And like the plaintiff in *Inteliclear* who
19   provided "specific features" of the system at issue, (*id.*, 658), Zaptera has amended its
20   pleading to specifically identify the "honeycomb" substructure that is what allows the
21   Aptera vehicle materials to resonate, flex, and recover from impact. Dkt. 36, SAC ¶¶
22   21, 91. Zaptera also identified that that this process involves a proprietary blend of
23   materials; disclosing those materials would destroy their secrecy status. *Id.* Similar
24   pleadings have also resulted in the denial of a defendant's motion to dismiss a trade
25   secret claim for lack of sufficient pleading particularity. *See, e.g., Alta Devices, Inc.*
26   *v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) [finding plaintiff
27   adequately alleged its trade secrets by identifying methods related to high throughput
28   thin-film deposition; epitaxial lift-off of the thin-film; and GaAs substrate

**PROOF OF SERVICE**

maintenance and re-use, and manufacturing concepts and processes related to the same]; *Dairy, Ltd. Liab. Co. v. Milk Moovement, Inc.*, No. 2:21-cv-02233 WBS AC, 2022 WL 1103822 (E.D. Cal. Apr. 13, 2022) [finding that plaintiff repeatedly described its trade secrets throughout the complaint, including one trade secret related to the methodology in which plaintiff handled Federal Milk Marketing Order pooling that is unique in the industry; the court found that plaintiff identified a distinct system and component therein]. Again, Zaptera has specifically identified the "honeycomb" substructure, which is the result of secretive manufacturing methods and proprietary materials blend that are unknown in the industry.

Defendants argue that the only relevant allegation in the SAC added for this Trade Secret is related to the durable "honeycomb" structure, and that that structure was a matter of general knowledge. Mot. 5. As an initial matter, Defendants' argument is a clear attempt to diminish the significance of the "honeycomb" substructure. As plead in the SAC, the "honeycomb" substructure is what allows the materials needed to make the aerodynamic dynamic vehicle to "resonate, flex, and recover from impact." Dkt. 36, SAC ¶ 21. Defendants have not identified anything to support their contention that the specific way the "honeycomb" substructure was developed for the Aptera vehicle is generally known or publicly available; instead, Defendants seem to suggest that Zaptera should be required to publicly disclose the specifics of this trade secret, which would ultimately result in the loss of the trade secret status. Again, California law does not require that trade secrets be disclosed in detail at the pleading stage. *See Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-2658, 2010 WL 2228936, at *13 (N.D. Cal. 2010) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968) (While a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade . . . to permit the defendant to ascertain at least the boundaries within which the secret lies, the complaint need not 'spell out the details of the trade secret,' but must simply provide 'reasonable notice of the issues which must be met at the time of trial

1  and to provide reasonable guidance in ascertaining the scope of appropriate

2  discovery.'"). Defendants' argument simply makes no sense.

3      Moreover, Zaptera also explains that the futuristic body shape of the vehicle

4  can only be achieved by using a proprietary combination of materials, which resulted

5  in the vehicle being able to achieve a previously unmatched strength-to-weight ratio

6  allowing for flexibility and fluidity in the angles and design that are necessary to

7  manufacture the aerodynamic vehicle. *Id.* SAC ¶¶ 20-21. Defendants do little to

8  address these allegations and instead focus their attention on the purported public

9  disclosure of this trade secret. Though the Motion concludes that "demonstrations"

10  render this trade secret a "matter[] of general knowledge in the trade[,]" (Mot. 5),

11  Defendants fail to explain how using a two-by-four to demonstrate the strength of the

12  proprietary material blend would somehow detail the proprietary material blend to

13  observers. Defendants' reliance on *Amgen Inc. v. Cal. Corr. Health Care Servs.*, 47

14  Cal. App. 5th 716, 736 (2020) fails for this same reason. Mot. 5-6. Similarly, *P2i Ltd.*

15  is inapplicable to this present case as the trade secrets claimed in that case were found

16  to be disclosed in a ***utility*** patent, which revealed the method of depositing a polymeric

17  material onto a substrate. *P2i Ltd. v. Favored Tech USA Corp.*, No. 23-cv-01690-

18  AMO, 2024 WL 4294652. Here, there is no utility patent referencing the

19  manufacturing method utilizing a proprietary material blend. Defendants have not

20  identified anything in the design patents that suggests that this process has been

21  publicly disclosed. Indeed, if it were so easy to identify the proprietary material blend,

22  why have Defendants not done so in their Motion?

23      The Motion rounds out its Trade Secrets arguments through a list of string

24  citations without analogizing those cases to the facts of the present case and a

25  conclusory statement that the Zaptera did "not connect the 'design secrets' alleged to

26  [Zaptera's] confidentiality practices." Mot. 6. First, as a factual matter, Defendants

27  are incorrect; the SAC's allegations regarding efforts to maintain secrecy are

28  addressed in detail below.

**PROOF OF SERVICE**

1    Regardless, the fact that Defendants failed to analogize the cited cases to the
2    present action is likely for good reason; those cases are distinguishable from the
3    pleadings here. In *Teradata Corp.*, the court found that there were "no allegations
4    suggesting what the proprietary information regarding optimization was, or how or
5    why it is proprietary besides simply being labeled a trade secret." Mot. 6, citing
6    *Teradata Corp. v. SAP SE*, No. 18-cv-03670-WHO, 2018 WL 6528009, at *4 (N.D.
7    Cal. Dec. 12, 2018). As explained, the SAC identifies the specific "honeycomb"
8    substructure, states that the substructure is made of a proprietary blend of materials
9    and manufacturing methods that allows the materials to resonate, flex, and recover
10   from impact. Dkt. 36, SAC ¶ 21. Defendants' reliance on *Abbvie Inc.* fails for the same
11   reason, as the complaint in that case identified only "proprietary payloads, linker-
12   drugs, and ADCs", which is significantly less than what the SAC alleges. Mot. 6,
13   citing *Abbvie Inc. v. Adcentrx Therapeutics Inc.*, No. 3:23-cv-02290-BEN-DEB, 2024
14   WL 3611144, at *5 (S.D. Cal. July 29, 2024). Likewise, *Farhang* contained two
15   alleged trade secrets: one related to a "core technology" which was described in an
16   attached patent, and one that was simply "specific business models and
17   implementations." Mot. 6, citing *Farhang*, 2010 WL 2228936, at *14. Notably, only
18   the second trade secret was dismissed for lack of particularity, and the court expressly
19   found that by attaching the patent with information relevant to the trade secrets,
20   "plaintiffs have identified the core technology in a way such that defendants have
21   reasonable notice of the issues which must be met at the time of trial and to provide
22   reasonable guidance in ascertaining the scope of appropriate discovery." *Id.* (internal
23   quotations and citations omitted). And in *Pellerin*, the court found the trade secret
24   pleadings to be insufficient because the only allegations were related to the inevitable
25   disclosure doctrine and the final end product. Mot. 6, citing *Pellerin*, 877 F. Supp. 2d
26   at 990. That is not the case here.
27       Defendants further argue that Zaptera does not adequately allege its
28   manufacturing methods trade secrets. But the SAC expressly states that Aptera I



**PROOF OF SERVICE**

"considered all non-public aspects of its technology to be highly confidential, and took extensive measures to protect its proprietary information." Dkt. 36, SAC ¶ 22. In support of this allegation, Zaptera included photographs of the numerous boxes and binders of NDAs, and showed submissions to the U.S. Department of Energy that were marked exempt from FOIA disclosures due to containing confidential and proprietary information. *Id.* ¶¶ 22, 24. Even more specifically, the SAC pleads that confidential information was shared only in discrete subparts subject to an NDA, including for composite manufacturers. *Id.* ¶ 23.

Zaptera also explained that during the Aptera I ABC process, the ultimate assignment of Aptera I's assets included all "related documentation," which included those same confidentiality agreements and NDAs. *Id.* ¶ 35. Zaptera stated that it purchased those assets and "related documentation" through the Asset Purchase Agreement, and still maintains possession of that information. *Id.* ¶¶ 37-38. Finally, Zaptera amended its pleading to affirmatively state that since the execution of the Asset Purchase Agreement and assignment of assets, Zaptera (1) "kept original paper files for the confidentiality agreement and documentation of the trade secrets secured in a locked space, for which only one individual had key access"; and (2) "digital files were kept secure by maintaining password-protected file storage servers and limiting the number of individuals with access on a "need-to-know" basis." *Id.* ¶ 94.

Defendants argue that the "SAC does nothing to further specify the supposedly secret shape and mathematic ratios at issue[,]" and that the vehicle shape is public knowledge. Mot. 7. This argument is based on a clear misrepresentation of the Trade Secret at issue. Indeed, Defendants concede that Zaptera is alleging that vehicle design and shape "is the product" of the confidential manufacturing processes and proprietary blend of materials. *Id.* Defendants' soda bottle example further supports Zaptera's position, as Defendants expressly state that a "soda bottle may well be manufactured using trade secret processes." *Id.* That is ***exactly*** what Zaptera has plead regarding the Aptera vehicle. *See, e.g.*, Dkt. 36, SAC ¶ 20 ( the "futuristic body shape and look …

was only achievable through the use of a proprietary combination of materials and manufacturing methods…"); ¶ 21 ("Aptera achieved this through use of the proprietary blend of materials, manufacturing, and design[, which resulted in] previously unmatched strength-to-weight ratio that allowed it more flexibility and fluidity in the angles and design of the vehicle to achieve the aerodynamic shape[;] also referencing the unique "honeycomb" substructure allowing for the materials to resonate, flex, and recover from impact). Defendants' attempt to mischaracterize this Trade Secret does not overcome the fact that the pleadings show the claimed Trade Secret is not the shape itself, but rather the design secrets necessary to achieving the shape of the Aptera vehicle with optimized aerodynamics.

Zaptera has already addressed above why Defendants' reliance on *Pellerin* fails. Mot. 7, citing *Pellerin*, 877 F. Supp. 2d at 988. Similarly, Defendants' reliance on *Imax Corp.* and *Ultimax Cement Mfg. Corp.* is misplaced. *Id.*, 7-8. In *Imax Corp.*, the alleged trade secrets related to "dimensions and tolerances" were deemed insufficiently plead because "it does not clearly refer to tangible trade secret material." *Imax Corp.*, 152 F.3d at 1167. Here, the SAC makes express reference to the "honeycomb" substructure, the benefits of that structure, and states that that structure, combined with the proprietary materials blend and manufacturing processes, are what allows the shape of the Aptera vehicle to be achievable. Dkt. 36, SAC ¶ 21. Likewise, Defendants cite *Ultimax Cement Mfg. Corp.* in support of their argument the Trade Secrets are in the public domain; however, as stated above, Defendants have not identified any supporting evidence that would tend to show someone witnessing a demonstration of the Aptera vehicle could then recreate it. Mot. 7, citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009).

Under the same incorrect premise, Defendants next argue that "the shape and ratios" of the Aptera vehicle "are evident in the design patents," and thus do not qualify as trade secrets. Mot. 7-8. Again, this is based on Defendants' own mischaracterization of the SAC. The Trade Secret on this point lies in how to achieve

the shape through the use of secret manufacturing processes and proprietary material blends. And even if Defendants' contention were true, why have they not identified the specific ratios if they are publicly available? For the reasons discussed above regarding alleged public disclosure and sufficient particularity requirements, Defendants' reliance on *Ultimax Cement Mfg.*, 587 F.3d at 1355 and *Bladeroom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-01370-EJD, 2015 WL 8028294, at *4 (N.D. Cal. Dec. 7, 2015) does not help Defendants.

**2. The SAC Sufficiently Alleges that Zaptera took Reasonable Measures to Maintain the Secrecy of the Trade Secrets.**

Defendants argues the secrecy measures in the SAC fail to "connect the 'design secrets' [or 'manufacturing method[s]'] alleged to these confidentiality practices." Mot. 6-7. Defendants are wrong. The SAC expressly pleads that Aptera I "considered all non-public aspects of its technology to be highly confidential, and took extensive measures to protect its proprietary information." SAC ¶ 22. Examples include: (1) Aptera I requiring NDAs for all third-parties Aptera I planned to discuss its technology with; (2) limiting information sharing to discrete subparts of information, subject to NDA, to prevent any individual vendor from having access to all Trade Secrets; (3) marking Department of Energy Applications as containing highly confidential information and being exempt from FOIA requests; and (4) requiring employees, including Individual Defendants, to sign confidentiality agreements. *Id.* ¶¶ 22-25, 93.

The SAC further states that following the execution of the Asset Purchase Agreement, the "related documentation" that was transferred to Zaptera included those same confidentiality agreements and NDAs. *Id.* ¶¶ 35, 94. If those documents did not fall within the Asset Purchase Agreement, then how would Zaptera have copies of all the documents for which it provided photos of in the SAC? Moreover, Zaptera specifically identified its ongoing measures to protect the secrecy of the Trade Secrets, including by keeping such documents secured in a locked space that only one individual had key access to, and by keeping digital files secure by maintaining

password-protected file storage servers and limiting the numbers of individuals with access to those with a "need-to-know" basis. *Id.* ¶ 94. Thus, Zaptera has adequately plead the efforts taken to maintain the secrecy of the Trade Secrets.

### 3. The SAC Sufficiently Alleges that Aptera's and the Individual Defendants' Actions Constitute Clear Misappropriation.

Defendants contend that the SAC "does not plausibly allege misappropriation." Mot. 9. In support of this contention, Defendants attempt to split hairs with carefully selected excerpts using the phrases "related to" and "subject of", and by arguing that Zaptera's allegations in the SAC are "conclusory" and "without facts." *Id.* 9-10. But this is not so; Defendants' decision to ignore the facts plead in the SAC does not mean that those facts do not exist. Notably, Defendants fail to address ***any*** of the SAC's citations to the Individual Defendants' public statements acknowledging their intentional use of the Trade Secrets, which were intended to be as similar as possible as the original Aptera sEV. *See, e.g.*, Dkt. 36, SAC ¶¶ 5, 43, 63-64, 66.

As explained in Section IV.A.2, Zaptera has sufficiently plead allegations of the Individual Defendants' acts of misappropriation. Defendants' attempt to argue that the work relating to "overseeing exterior aesthetics (color, material, finish)," "crafting the aerodynamic shape," and making "material choices to suit the shape and design" are not alleged as trade secrets and are public information by way of the Zaptera Patents. Mot. 9. Not so. Nothing in the Zaptera Patents publicly discloses how to achieve the proprietary materials blend and manufacturing method needed to create the Aptera vehicle. And Defendants have not identified any other such public disclosure because they know that doing so would destroy the Zaptera Trade Secrets that Defendants are currently using to continue developing the aerodynamic vehicle. Moreover, the excerpted language regarding exterior aesthetics and material choices is directly relevant to the resumed use of the Trade Secrets between Aptera I and Aptera II described in section IV.A.

/ / /

1    The only other support Defendants provide is another list of string citations with
2    cherry-picked phrases that Defendants have failed to analogize to the present case.
3    Again, these cases are easily distinguishable from this action. Two of those cases
4    involved bare allegations of trade secrets being plaintiff's "customer list, supplier list,
5    and confidential business information," or using "proprietary information in …
6    communications with counsel, in soliciting investors and employees…" Mot. 10,
7    citing *Veronica Foods Co. v. Ecklin*, No. 16-cv-07223-JCS, 2017 WL 2806706, at *14
8    (N.D. Cal. June 29, 2017); and *Hum. Longevity, Inc. v. J. Craig Venter Inst., Inc.*, No.
9    18cv1656-WQH-LL, 2018 WL 6617633, at *6 (S.D. Cal. Dec. 18, 2018),
10   respectively. As explained above, Defendants did not even attempt to argue that
11   Zaptera's allegations are similar to these cases, as the SAC has provided specific detail
12   as to the allegations regarding the identification of the Trade Secrets, as well as
13   Defendants' improper resumed use.

14       Defendants next argue that Zaptera is relying on the inevitable disclosure
15   theory. Mot. 10-11. Not so. This is not simply an allegation of rehiring. Indeed, the
16   SAC expressly alleges that each of the Defendants resumed use of the Trade Secrets
17   that they knew had been sold to Zaptera. Dkt. 36, SAC ¶¶ 2, 46, 49. As noted earlier
18   in this Opposition, Plaintiff identified specific public statements made by various
19   Defendants indicating that this was Defendants' plan all along.

20       Courts have held that "employing the confidential information in
21   manufacturing, production, research or development, marketing goods that embody
22   the trade secret, or soliciting customers through the use of trade secret information, all
23   constitute use." Rest.3d Unfair Competition, § 40, com. c, p. 455; *PMC, Inc. v.*
24   *Kadisha* (2000) 78 Cal.App.4th 1368, 1383. That is exactly what is alleged in the
25   SAC—not merely an allegation that some Defendants went to work for a competing
26   company. This is the resuscitation of the same company, with virtually the same team,
27   who has resumed use of the Trade Secrets after they all believed no one else was
28   around to enforce the IP rights.

**PROOF OF SERVICE**

1    **C. <u>The SAC Adequately Alleges Zaptera's Breach of Contract Claim.</u>**

2        Defendants argue Zaptera references "unspecified 'Confidentiality

3    Agreements", fails to plead (1) relevant terms; (2) Zaptera's legal interest; and (3) a

4    breach. Mot. 11-12. For the reasons explained below, each of these arguments fail.

5    **1. Zaptera Pleads an Enforceable Agreement that Defendants Breached.**

6        To state a claim for breach of contract, a plaintiff must plead "the contract,

7    plaintiffs' performance (or excuse for nonperformance), defendant's breach, and

8    damage to plaintiff therefrom." *Gautier*, 234 Cal. App. 2d at 305. Defendants

9    acknowledge that in stating a claim, a complaint may "clearly allege the substance of

10   the relevant terms." Mot. 12, citing *Ramirez v. GMAC Mortg.*, No. CV 09-8189 PSG

11   (FFMX), 2010 WL 148167, at *2 (C.D. Cal. Jan. 12, 2010) (also noting that a plaintiff

12   may plead a contract "according to its legal effect").

13       Defendants incorrectly state that "Zaptera does not even identify any particular

14   contract." Mot. 12. The SAC identifies both Proprietary Information and Inventions

15   Agreements and Confidentiality Agreements. *See* Dkt. 36, SAC ¶¶ 25, 94, 104-09. As

16   to terms, the SAC expressly alleges that the NDAs signed by the Individual

17   Defendants while at Aptera I required employees to acknowledge "their obligations

18   to maintain the secrecy of Aptera [I's] confidential and proprietary information. *Id.* ¶

19   35. And contrary to Defendants' claim, (Mot. 12), nothing in the SAC even remotely

20   suggests that either of these agreements would prevent any Defendant from engaging

21   in lawful business. Defendants are free to start any business they choose or to perform

22   any work they desire, so long as that work does not improperly use assets that were

23   sold to Zaptera. As identified above, multiple Individual Defendants have made public

24   statements confirming their intent to use exactly those assets.

25       The SAC also properly pleads breach. Defendants argue nothing but a

26   conclusory statement to the contrary. *See* Mot. 14-15. The SAC alleges that

27   Armstrong, Anthony, Fambro, and Hill had access to, and knowledge of, Aptera I's

28   confidential and proprietary information, which they all used in working on the design

**PROOF OF SERVICE**

of the Aptera I aerodynamic vehicle, and resumed said use while working for Aptera II. *Id.* ¶¶ 29, 67. The SAC expressly alleges that each of Armstrong's, Anthony's, Fambro's, and Hill's Confidentiality Agreements were binding, valid, and enforceable as between Aptera I and Armstrong. *Id.* ¶¶ 104-05. Aptera I performed all obligations owed of it under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due. *Id.* ¶ 106. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby each of Fambro, Anothony, Hill, and Armstrong owed Plaintiff a duty to keep that same confidential information confidential. *Id.* ¶ 107. Fambro, Anothony, Hill, and Armstrong breached their respective Confidentiality Agreements to the extent they used and disclosed the Trade Secrets while advancing the interests of Aptera II. *Id.* ¶ 108.

Thus, the SAC adequately pleads the existence and breach of a contract.

## 2. Zaptera Pleads that it Obtained Ownership of the Contract Rights with Each Defendant through the Asset Purchase Agreement.

Defendants incorrectly contend that the SAC does not allege that Zaptera owns any contract rights with a Defendant. Mot. 14. Defendants do not dispute that Zaptera acquired the rights to the Trade Secrets through the Asset Purchase Agreement. Those same rights encompass former Aptera I employees' obligations to maintain the secrecy of those Trade Secrets pursuant to their respective NDAs. To argue otherwise suggests that Aptera I sold Zaptera Trade Secrets with no value. And as alleged in the SAC, the Assignment included all "related documentation," which encompasses Confidentiality Agreements and NDAs signed by the Individual Defendants. Dkt. 36, SAC ¶ 35. Simply put, the Trade Secrets could not have existed without requiring the signed confidentiality agreements and NDAs.

## D. <u>In the Alternative, Any Dismissal Should be Without Prejudice to Afford Plaintiff an Opportunity to Amend to Cure Any Perceived Deficiencies.</u>

If the Court finds any claim in the SAC deficient, Plaintiff respectfully requests leave to amend. The Ninth Circuit has repeatedly held that "leave to amend should be

**PROOF OF SERVICE**

freely given when justice so requires." Fed. R. Civ. P. 15(a); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003). This principle is especially true when dismissal is based on technical pleading deficiencies. The proposed amendment would provide Plaintiff the opportunity to correct any perceived deficiencies in the pleading, particularly as to the cause of action for breach of contract.

Furthermore, no undue prejudice will result from granting Plaintiff leave to amend. The case is still in its early stages—Defendants have refused to initiate a Rule 26 meet and confer and so discovery has not commenced—and there has been no undue delay. Allowing Plaintiff to amend the SAC would facilitate the proper resolution of the claims on their merits and prevent a potential injustice.

## V.    CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety. In the alternative, if the Court finds any claim insufficiently pled, Plaintiff requests leave to amend the SAC to address any deficiencies.

Dated: August 1, 2025                          **ATABEK & CO.**

                                               */s/ Jon A. Atabek*
                                               Jon A. Atabek, Esq.
                                               Nyja A. Prior, Esq.

Dated: August 1, 2025                          **MORROW NI, LLP**

                                               */s/ Xinlin L. Morrow*
                                               Xinlin L. Morrow, Esq.
                                               *Attorneys for Plaintiff,*
                                               *ZAPTERA USA, INC.*

**PROOF OF SERVICE**

**APPENDIX 1**

| Individual Defendant | Allegation in SAC |
|---|---|
| Michael Johnson | Founder of Aptera I (SAC ¶¶ 18-19) |
| | Signed a Proprietary Information and Inventions Agreement for Aptera I (SAC ¶ 25) |
| | Following the passing of Rick Derringer, ("Derringer"), Johnson believed there was no one left to enforce Plaintiff's Intellectual Property rights (SAC ¶ 40) |
| | Johnson helped officially relaunch Aptera I in March 2019, incorporating as Aptera Motors Corp. (Aptera II) (SAC ¶ 41) |
| | By November 27, 2024, Aptera Motors publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle following Aptera Motors' reemergence in 2019 and its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012 (SAC ¶ 67) |
| | By resuscitating Aptera I, accepting and moving forward with manufacturing vehicles using the infringing designs, Johnson resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle. (SAC ¶¶ 78, 86) |
| Nathan Armstrong | Signed a Proprietary Information and Inventions Agreement for Aptera I (SAC ¶ 25) |
| | Worked with Anthony and Fambro at Aptera I to come up with the original body design of the Aptera aerodynamic vehicle (SAC ¶ 26) |
| | From 2006 through 2008, worked as a lead engineer with Hill and others to develop the body of the Aptera Aerodynamic vehicle, including the proprietary blend of materials and manufacturing method for use of those materials in developing the ultralight/strong body of the vehicle, including developing the materials that allowed for the vehicle's design (SAC ¶ 28) |
| | While at Aptera I, Armstrong had access to, and knowledge of, Aptera I's confidential and proprietary information, which they both used in working on the design of the Aptera aerodynamic vehicle (SAC ¶ 29) |



**PROOF OF SERVICE**

| | | |
|---|---|---|
| | Nathan Armstrong | Armstrong is a named inventor on the two Zaptera Patents: "Aerodynamic Vehicle" and "Aerodynamic Vehicle Body", U.S. Patent Nos. D633821 (the "'821 Patent") and D635487 (the "'487 Patent") (SAC ¶ 32, Exs. 1-2) |
| | | Following the passing of Rick Derringer, ("Derringer"), Armstrong believed there was no one left to enforce Plaintiff's Intellectual Property rights (SAC ¶ 40) |
| | | Aptera II rehired Armstrong, who was one of the original designers and engineers responsible for Aptera's unique body design and use of materials, and is a named inventor on the Zaptera Patents. (SAC ¶ 42) |
| | | Armstrong participated in a public interview in 2023, where he explained that the IP was offered back to Aptera II following Derringer's passing, to which Armstrong stated Anthony and Fambro responded "Yes!"; however, Derringer never owned Aptera I assets in any way and did not have authority to give those assets to Aptera II (SAC ¶¶ 43-45) |
| | | Armstrong further explained that within a matter of days, in November 2019, Anthony and Fambro obtained funding to resume Aptera's development of the aerodynamic vehicle and began reaching out to former employees, including Hill, all of whom were involved with the engineering and building of the vehicle by June 2020, when they "got the band back together." In other words, Aptera Motors continued using the exact same IP, including the Zaptera Patents and Trade Secrets, that were sold to Plaintiff nearly a decade prior. Notably, Armstrong made no mention of any agreement or other consideration that was offered to Plaintiff in exchange for Defendants resumed use of Plaintiff's Intellectual Property. (SAC ¶ 46) |
| | | Armstrong worked with Hill on material choices to suit the shape and design of the Aptera II vehicle, which including work related to the subject matter covered by the Zaptera Patents and Trade Secrets (SAC ¶ 48) |
| | | Armstrong is the CTO of Aptera II and resumed work on the aerodynamic vehicle design in 2019. Thereafter, Armstrong resumed work on the aerodynamic vehicle shape that he previously worked on at Aptera I, which is the subject matter of the Zaptera Patents, and the proprietary materials blend and manufacturing methods that are the subject of the assigned Trade Secrets. (SAC ¶ 49) |
| | | On March 9, 2021, Aptera II obtained a new design patent for a "Three Wheeled Vehicle" numbered D912586 (the "'586 Patent"), which names Armstrong as an inventor; the '586 Patent depicts the original |

**PROOF OF SERVICE**

| | | |
|---|---|---|
| | | Aptera vehicle that is the subject of the Zaptera Patents, and only purports to patent a specific design element of the rear wheel cover and shape of the very back-end of the vehicle (SAC ¶ 51, Ex. 5) |
| | | By November 27, 2024, Aptera II publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle following Aptera Motors' reemergence in 2019 and its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012. (SAC ¶ 67) |
| | Nathan Armstrong | Armstrong, as the Chief Technology Officer of Aptera II, infringed upon the Zaptera Patents—for which Armstrong is a named inventor—by resuming development of the Aptera vehicle's exterior aesthetics and crafting the aerodynamic shape and materials choices. (SAC ¶¶ 78, 86) |
| | | Aptera I employees, including Armstrong, were required to sign agreements including non-disclosure terms prohibiting them from copying, using, or distributing the foregoing trade secrets outside of their roles as employees of Aptera I. (SAC ¶ 93) |
| | | Armstrong used the Zaptera trade secrets to manufacture Aptera II's newest vehicle designs, which incorporate the proprietary blend of materials and manufacturing methods used to manufacture the original Aptera I vehicles that Plaintiff acquired through the Asset Purchase Agreement. (SAC ¶ 99) |
| | | Armstrong executed a written employment contracts (regardless of whether formally titled Proprietary Information and Inventions Agreement or otherwise) with Aptera I, which contained an agreement regarding the use and non-disclosure of confidential information belonging to Aptera Motors, Inc., including the Trade Secrets (the "Confidentiality Agreement"). The Confidentiality Agreements were binding, valid, and enforceable as between Aptera I and Armstrong. Aptera Motors, Inc., performed all obligations owed of them under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby Armstrong owed Plaintiff a duty to keep that same confidential information confidential. Armstrong breached the Confidentiality Agreements to the extent he used and disclosed the Trade Secrets. (SAC ¶¶ 104-08) |

**PROOF OF SERVICE**

| Nathan Armstrong | |
|---|---|
| Chris Anthony | Founder of Aptera I (SAC ¶¶ 18-19) |
| | Signed a Proprietary Information and Inventions Agreement for Aptera I (SAC ¶ 25) |
| | While working at Aptera I, Anthony worked with Hill, Armstrong, Wheeler, and Fambro to come up with the original design for the unique body design of Apteras's aerodynamic vehicles (SAC ¶ 26) |
| | Following the passing of Rick Derringer, ("Derringer"), Anthony believed there was no one left to enforce Plaintiff's Intellectual Property rights, and moved forward with the launch of Aptera II (SAC ¶¶ 40-41) |
| | Anthony contributed to Aptera II's decision to hire several of the original designers and engineers responsible for Aptera's unique body design and use of materials, including Hill, Armstrong, and Wheeler, each of whom are listed as inventors on the Zaptera Patents. (SAC ¶ 42) |
| | Anthony contributed to Aptera II's decision to get "the band back together" after securing funding to continue developing the Aptera vehicle. Aptera II continued using the exact same IP, including the Zaptera Patents and Trade Secrets, that were sold to Plaintiff nearly a decade prior. (SAC ¶ 46) |
| | On March 9, 2021, Aptera II obtained a new design patent for a "Three Wheeled Vehicle" numbered D912586 (the "'586 Patent"), which names Anthony as an inventor; the '586 Patent depicts the original Aptera vehicle that is the subject of the Zaptera Patents, and only purports to patent a specific design element of the rear wheel cover and shape of the very back-end of the vehicle (SAC ¶ 51, Ex. 5) |
| | On or around September 12, 2022, Anthony, emphasizing the Aptera vehicle design, stated that while other companies were improving efficiency at the expense of design aesthetics, "Aptera proves that new and exciting designs can still be made in different form factors while still achieving maximal efficiency." (SAC ¶ 64) |
| | By November 27, 2024, Aptera II publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle following Aptera Motors' reemergence in 2019 and |



**PROOF OF SERVICE**

| | | |
|---|---|---|
| | | its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012. (SAC ¶ 67) |
| | | On July 28, 2022, Zaptera sent a letter to Anthony seeking to discuss Aptera II's unauthorized use of the Zaptera Patents, hoping to resolve the matter amicably. Aptera II was using the very same designs Aptera I had sold to Plaintiff for one-and-a-half million dollars some ten years earlier, without permission, and without either paying licensing fees or repurchasing the patents from Plaintiff. The Zaptera Letter compares photos of Aptera II's current vehicles to the drawings on the Zaptera Patents, and then states, "the Aptera vehicle appears to infringe the Zaptera patents and any use, manufacture, sale, offer for sale, and importation of the Aptera vehicle in the United States is unauthorized and in violation of Zaptera's patent rights." (SAC ¶ 69, Ex. 8) |
| | Chris Anthony | By resuscitating Aptera I as Aptera II, accepting and moving forward with manufacturing vehicles using designs infringing on the Zaptera Patents, Anthony resumed use of the Zaptera Patents by incorporating the covered subject matter into the design development of the new Aptera vehicle (SAC ¶¶ 78, 86) |
| | | Aptera I employees, including Anthony, were required to sign agreements including non-disclosure terms prohibiting them from copying, using, or distributing the foregoing trade secrets outside of their roles as employees of Aptera I. (SAC ¶ 93) |
| | | Execution and signing of the employment agreement by Fambro, Anthony, Hill and Armstrong. Upon information and belief, each of Fambro, Anthony, Hill, and Armstrong executed written employment contracts (regardless of whether formally titled Proprietary Information and Inventions Agreement or otherwise) with Aptera Motors, Inc., which agreement contained agreements regarding the use and non-disclosure of confidential information belonging to Aptera Motors, Inc., including the Trade Secrets (the "Confidentiality Agreement"). 105. The Confidentiality Agreements were binding, valid, and enforceable as between Aptera Motors, Inc. and each of Fambro, Anthony, Hill, and Armstrong. 106. Aptera Motors, Inc., performed all obligations owed of them under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby each of Fambro, Anthony, Hill, and Armstrong owed Plaintiff a duty to keep that same confidential information confidential. 108. Fambro, Anthony, Hill, and Armstrong breached the Confidentiality |

**PROOF OF SERVICE**

| Chris Anthony | Agreements to the extent they used and disclosed the Trade Secrets. (SAC ¶ 104-¶108) |
|---|---|
| Steve Fambro | Founder of Aptera I (SAC ¶¶ 18-19) |
| | Signed a Proprietary Information and Inventions Agreement for Aptera I (SAC ¶ 25) |
| | Following the passing of Rick Derringer, ("Derringer"), Fambro believed there was no one left to enforce Plaintiff's Intellectual Property rights (SAC ¶¶ 40-41) |
| | Relaunch of Aptera Motors in March 2019. Accordingly, Anthony, Fambro, and Johnson officially relaunched Aptera Motors in March 2019, incorporating as Aptera Motors Corp. (instead of Aptera Motors, Inc.) (SAC ¶ 41) |
| | Aptera Motors began to hire original designers and engineers responsible for Aptera body design. Aptera Motors, through Anthony and Fambro, went on to hire several of the original designers and engineers responsible for Aptera's unique body design and use of materials, including Hill, Armstrong, and Wheeler, each of whom are listed as inventors on the Zaptera Patents. (SAC ¶ 42) |
| | Obtained funding to resume Aperta development: Armstrong further explained that within a matter of days, in November 2019, Anthony and Fambro obtained funding to resume Aptera's development of the aerodynamic vehicle and began reaching out to former employees, including Hill, all of whom were involved with the engineering and building of the vehicle by June 2020, when they "got the band back together."3 In other words, Aptera Motors continued using the exact same IP, including the Zaptera Patents and Trade Secrets, that were sold to Plaintiff nearly a decade prior. Notably, Armstrong made no mention of any agreement or other consideration that was offered to Plaintiff in exchange for Defendants resumed use of Plaintiff's Intellectual Property. (SAC ¶ 46) |
| | Named as designers of "Three Wheeled Vehicle" in 2021. For instance, on March 9, 2021, Aptera Motors obtained a new design patent for a "Three Wheeled Vehicle" numbered D912586 (the "'586 Patent"), which names Hill, Fambro, Anthony, and Armstrong as inventors. (SAC ¶ 51) |
| | By November 27, 2024, Aptera Motors publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in |



**PROOF OF SERVICE**

| | | |
|---|---|---|
| | | the Aptera vehicle following Aptera Motors' reemergence in 2019 and its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012. (SAC ¶ 67) |
| | Steve Fambro | Employees were required to sign an agreement including NDA prohibiting them from copying Aperta 1. More specifically, each of Aptera Motors, Inc.'s employees, including Anthony, Fambro, Hill, and Armstrong, were required to sign agreements including non-disclosure terms prohibiting them from copying, using, or distributing the foregoing trade secrets outside of their roles as employees of Aptera Motors, Inc. Aptera Motors, Inc. also required vendors and third-parties to sign NDAs, and marked documents submitted to the U.S. Department of Energy as exempt from the Freedom of Information Act. Additionally, Plaintiff is informed and believes Aptera Motors, Inc. restricted access to paper documentation of those trade secrets to employees who needed access to those materials, and kept that documentation under lock-and-key. (SAC ¶ 93) |
| | | Anthony executed a written employment contracts (regardless of whether formally titled Proprietary Information and Inventions Agreement or otherwise) with Aptera I, which contained an agreement regarding the use and non-disclosure of confidential information belonging to Aptera Motors, Inc., including the Trade Secrets (the "Confidentiality Agreement"). The Confidentiality Agreements were binding, valid, and enforceable as between Aptera I and Armstrong. Aptera Motors, Inc., performed all obligations owed to Armstrong under the terms of the Confidentiality Agreement, except to the extent any such obligations were excused, or not yet due. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby Armstrong owed Plaintiff a duty to keep that same confidential information confidential. Armstrong breached the Confidentiality Agreements to the extent he used and disclosed the Trade Secrets. (SAC ¶¶ 104-08) |
| | Jason Hill | Signed a Proprietary Information and Inventions Agreement for Aptera I (SAC ¶ 25) |
| | | Worked with Armstrong, Anthony and Fambro at Aptera I to come up with the original body design of the Aptera aerodynamic vehicle (SAC ¶ 26) |
| | | Worked at Aptera I from 2006 through 2009, focusing on interior and exterior design of Aptera aerodynamic vehicle (SAC ¶ 27) |
| | | From 2006 through 2008, Hill worked with Armstrong and others to develop the body of the Aptera Aerodynamic vehicle, including the proprietary blend of materials and manufacturing method for use of |



**PROOF OF SERVICE**

| | | |
|---|---|---|
| | | those materials in developing the ultralight/strong body of the vehicle, including developing the materials that allowed for the vehicle's design; the Trade Secrets Hill helped develop make the unique aerodynamic body shape of the Aptera vehicle a reality (SAC ¶ 28) |
| | | While at Aptera I, Hill had access to, and knowledge of, Aptera I's confidential and proprietary information, which they both used in working on the design of the Aptera aerodynamic vehicle (SAC ¶ 29) |
| | | Hill is a named inventor on the two Zaptera Patents: "Aerodynamic Vehicle" and "Aerodynamic Vehicle Body", U.S. Patent Nos. D633821 (the "'821 Patent") and D635487 (the "'487 Patent") (SAC ¶ 32, Exs. 1-2) |
| | | Following the passing of Rick Derringer, ("Derringer"), Hill believed there was no one left to enforce Plaintiff's Intellectual Property rights (SAC ¶¶ 40-41) |
| | Jason Hill | Aptera II rehired Hill, who was one of the original designers and engineers responsible for Aptera's unique body design and use of materials, and is a named inventor on the Zaptera Patents. (SAC ¶ 42) |
| | | Hill, as Aptera II's Chief of Design from January 2019 through January 2025, publicly touted the aerodynamics and aesthetics of the design in promoting the return of Aptera and continued development of their new vehicles. Upon information and belief, Hill led the comprehensive design vision for Aptera's newest version of its aerodynamic electric vehicles. Hill's work for the resuscitated Aptera Motors Corp. included (1) overseeing exterior aesthetics (color, material, finish); (2) crafting the aerodynamic shape; and (3) working with Armstrong on material choices to suit the shape and design, all of which include work related to the subject matter covered by the Zaptera Patents and Trade Secrets. Hill is touted as the "Vehicle Designer" of the Aptera vehicle on Aptera's own website. (SAC ¶ 48) |
| | | Named as designers of "Three Wheeled Vehicle" in 2021. For instance, on March 9, 2021, Aptera Motors obtained a new design patent for a "Three Wheeled Vehicle" numbered D912586 (the "'586 Patent"), which names Hill, Fambro, Anthony, and Armstrong as inventors. (SAC ¶ 51, Ex. 5) |
| | | In a May 24, 2025, interview with Anthony Reale of Design Impact, Hill states "And one of the things that design has done for Aptera, and indeed relates to your prior question, is the *value of excellence in design and I'm including the engineering in this like design, design engineering and the resultant, let's say aesthetic style*. All of those things make Aptera like the value proposition of Aptera is 3x the cost and the price at least. And that's a bold statement, but I firmly believe that there is, there's a value in all of the things that we've designed |

**PROOF OF SERVICE**

| | |
|---|---|
| | in." Hill also stated, "So if we go back to the beginning, *the core layout of the vehicle was established by the Founders*. So the influence of design is to take their vision and stick to it an incredibly stubborn manner and not to be influenced towards making it something other than what they want and what they believe in." Hill said that while the initial influence of the Morelli design played a role, "even the earliest [Aptera vehicle] sketches are *building upon* the basic shape." And regarding the proprietary material choice for creating the Aptera Vehicle, Hill stated, "*material choice is key because you want to reflect part of the value*." (SAC ¶ 63) |
| | Hill was interviewed on or around May 18, 2023, by The InEVitable podcast where he discussed the Aptera vehicle's design, structure and materials. Specifically, during that interview, Hill (1) discussed Aptera Motors' current use of "two types of composites"; (2) described how the current Aptera vehicle "needs to stay the same" as the original; (3) stated the Aptera vehicle does not have the word "Aptera" on the vehicle "because, just, it is." (SAC ¶ 66) |
| Jason Hill | By November 27, 2024, Aptera Motors publicly announced that it had reached $135 million in investments, which were based, at least in part, on the Plaintiff's Intellectual Property Aptera Motors used to develop the Aptera vehicle. Upon information and belief, each of Fambro, Anthony, Johnson, Hill, and Armstrong are or were involved in the use, or ratification of use, of Plaintiff's Intellectual Property in the Aptera vehicle following Aptera Motors' reemergence in 2019 and its continued development of the aerodynamic vehicle that Aptera Motors, Inc. started in 2006 and for which it sold the Intellectual Property to Plaintiff for in 2012. (SAC ¶ 67) |
| | Hill, as the Chief of Design of Aptera II, infringed upon the Zaptera Patents—for which Hill is a named inventor—by resuming development of the Aptera vehicle's exterior aesthetics and crafting the aerodynamic shape and materials choices. (SAC ¶¶ 78, 86) |
| | Aptera I employees, including Hill, were required to sign agreements including non-disclosure terms prohibiting them from copying, using, or distributing the foregoing trade secrets outside of their roles as employees of Aptera I. (SAC ¶ 93) |
| | Hill used the Zaptera trade secrets to manufacture Aptera II's newest vehicle designs, which incorporate the proprietary blend of materials and manufacturing methods used to manufacture the original Aptera I vehicles that Plaintiff acquired through the Asset Purchase Agreement. (SAC ¶ 99) |
| | Hill executed a written employment contracts (regardless of whether formally titled Proprietary Information and Inventions Agreement or |



**PROOF OF SERVICE**

| Jason Hill | otherwise) with Aptera I, which contained an agreement regarding the use and non-disclosure of confidential information belonging to Aptera Motors, Inc., including the Trade Secrets (the "Confidentiality Agreement"). The Confidentiality Agreements were binding, valid, and enforceable as between Aptera I and Hill. Aptera Motors, Inc., performed all obligations owed of them under the terms of the Confidentiality Agreements, except to the extent any such obligations were excused, or not yet due. Plaintiff received assignment of the Confidentiality Agreements through the ABC, whereby Hill owed Plaintiff a duty to keep that same confidential information confidential. Hill breached the Confidentiality Agreements to the extent he used and disclosed the Trade Secrets. (SAC ¶¶ 104-08) |